48 So.2d 553

## MAUND v. STATE.

### 4 Div. 602.

Supreme Court of Alabama.

Nov. 9, 1950.

454

E. C. Boswell, of Geneva, C. L. Rowe, of Elba, and E. O. Griswold, of Enterprise, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

LIVINGSTON, Justice.

John Maund was indicted, tried and convicted of murder in the first degree in the Circuit Court of Coffee County (Enterprise Div.), and his punishment fixed at death. This appeal is governed by sections 382(1) and 382(2), Title 15, Pocket Part of the Code of 1940, being the automatic appeal statute.

Appellant admitted that he killed William A. Whigham, called Willie Whigham, in front of Whigham's home at about 9:30 to 10:00 o'clock on the night of January 2, 1950. It is not denied that the difficulty, which culminated in Whigham's death, arose out of a dispute between appellant and Whigham as to which one of them had rented from Mrs. Wall a certain sixty-nine acres of land for the year 1950. The Wall land is located on the Enterprise-Geneva Highway, about four miles out from Enterprise, on the same side of the highway, and some one hundred and fifty or two hundred yards from the farm of Whigham. Appellant lived about six miles from Enterprise on the same highway. It is not disputed that Whigham had rented and farmed the Wall land for the years 1947, 1948 and 1949. Appellant introduced a three year lease covering the Wall land executed by Mrs. Wall to him on August 24, 1949 for the years 1950, 1951 and 1952, the term beginning January 1, 1950. The State introduced a receipt for $25, given

by Mrs. Wall to Whigham on June 24, 1949, reciting "1950 land rent".

The State's evidence tended to prove that for many years appellant and deceased had been friends; that they had had several conversations prior to the fatal difficulty concerning the rental of the Wall land for the year 1950; that each claimed priority as to its occupancy for that year; that Whigham had posted the land and was guarding it to prevent appellant or anyone else from gaining possession of it; that on the night that Whigham was killed, he and his son Boyd Whigham drove up in front of deceased's home about 9:30 in Boyd Whigham's truck; that deceased's home was some seventy-five yards off the highway, with a driveway leading up to the house; that at about the time deceased and Boyd Whigham got out of the truck, appellant parked his automobile across the highway opposite Whigham's driveway, and off the pavement or "black top," got out of the car, left the parking lights on and came across the highway and entered the driveway of Whigham; that appellant called to Whigham and, with protestations of friendship, asked Whigham to come down and talk with him about the land matter; that Whigham went about half way down his driveway and told appellant to go on home; Whigham also told his son Boyd to take the truck and go to town and get the officers; that Boyd Whigham got in the truck and drove to Enterprise, passing appellant near the entrance to the Whigham driveway; that after Boyd Whigham drove out of the driveway and into the highway, appellant started to walk toward deceased, still protesting his friendship; that deceased told appellant to stop, but that he kept walking and when within about twenty feet of deceased fired one shot at him and, thereupon the two closed in combat; that this struggle continued for a short time with the parties moving away from the house toward the highway; that four or five shots were fired in the course of this struggle; that deceased fell to the ground and appellant began striking or beating him about the head with the pistol; that the wife of the deceased ran to her husband's assistance and begged appellant to stop beating him; that appellant, with abusive language, threatened to kill her too; that she went back to the house; that appellant then went back to his automobile and drove away. Whigham was shot three times with a thirty-two caliber revolver, and was severely beaten about the head. There was evidence to indicate that Whigham died almost instantly from one of the pistol wounds. Boyd Whigham was gone for about twenty minutes and when he returned with a highway patrolman his father was dead.

Appellant's version of the fatal difficulty was that, he (the appellant) was passing Whigham's home in his automobile when Boyd Whigham forced him off the highway with his truck, about opposite the Whigham driveway; that Boyd Whigham and the deceased got out of the truck and came back to his car, opened the car door and dragged him from his car and across the highway into the Whigham driveway, beating him as they went, with one or the other of them trying to cut him with a knife; that they knocked him down, and that deceased tried to hit him with a claw hammer while he was on the ground and deceased was bending over him; that deceased told Boyd that they had him where they wanted him and for Boyd to go get the officers of the law; that Boyd left and that after he left deceased tried to hit him with the hammer while he was down; that under these circumstances or conditions he shot deceased with a pistol.

Although the appeal is under the statute, above noted, because of the infliction of the death penalty, appellant was represented in the court below, and here, by able and reputable counsel of his own choice. Feeling that they have continuously and ably represented their client, we will in the main confine this opinion to propositions argued in brief and in the order therein made.

The indictment was returned by the grand jury of Coffee County, Alabama, on February 8, 1950. On February 17, 1950, appellant filed his application for a change of venue, and the same was set for hearing on February 27, 1950. On the day set, the issue was submitted to the trial court on affidavits and the oral testimony of the witnesses on the part of the defendant and by counter affidavits on behalf of the State. The application was denied.

The burden is on the defendant to show to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected in order to achieve the right to a change of venue. Godau v. State, 179 Ala. 27, 60 So. 908; Patton v. State, 246 Ala. 639, 21 So.2d 844. The mere belief of the defendant or of his witnesses that he cannot receive such a trial is not enough. Lee v. State, 246 Ala. 343, 20 So.2d 471.

The most that can be said of defendant's evidence in support of his application for a change of venue is that it revealed public indignation at the atrocity of the crime immediately after its commission; general discussion of the guilt or innocence of the defendant; statements by one or two persons that defendant deserved the death penalty; rumors of similar statements by others not identified; rumor to the effect that defendant might be mobbed or lynched; the opinion of affiants that defendant could not get a fair trial and an unbiased verdict in Coffee County. These affidavits and statements by witnesses were, in substance, flatly contradicted by the affidavits of many other citizens of Coffee County. There is no evidence of any demonstration or the formation of a mob to take the law in its own hand, and there could not have existed any racial prejudice against defendant.

Under the provisions of Title 15, section 267, Code, it is the duty of this Court to review the action of the trial court in refusing to grant an application for a change of venue without any presumption in favor of the judgment or ruling of the lower court on said application. After a careful consideration of the application and affidavits and other evidence in support of and against the application, we feel that defendant failed to meet the burden above referred to, and it is our duty, under the law as it now exists, to affirm the action of the trial judge in refusing to grant the application for a change of venue. See the following cases: Baker v. State, 209 Ala. 142, 95 So. 467; Malloy v. State, 209 Ala. 219, 96 So. 57; Godau v. State, 179 Ala. 27, 60 So. 908; Collins v. State, 234 Ala. 197, 174 So. 296; Patton v. State, 246 Ala. 639, 21 So.2d 844; Lee v. State, 246 Ala. 343, 20 So.2d 471.

At his arraignment on February 27, 1950, appellant entered pleas of not guilty and not guilty by reason of insanity. When called to trial on March 9, 1950, appellant moved the court for permission to withdraw the pleas interposed upon his arraignment, and file a plea in abatement and a motion to quash the indictment. The plea and motion to quash were predicated on the alleged illegal filling of the jury box from which the grand jury was drawn, which returned the indictment against appellant, in that the jury commissioners, and each of them, and the clerk of the commission, had omitted or failed to take the oath of office prescribed by section 279 of the 1901 Constitution of Alabama and Title 30, sections 11 and 16, Code. In short, the argument is that the jury commission and the clerk thereof were wholly without authority to act, each having taken the following oath of office:

"The State of Alabama
"Coffee County

Probate Court.

"I, Marvin Weatherford, do solemnly swear that I am not disfranchised by the Constitution of Alabama, or by the Constitution or laws of the United States; that I will honestly and faithfully support and defend the Constitution and laws of the United States, the Union of the States, and the Constitution and laws of the State of Alabama, so long as I remain a citizen thereof; and that I will honestly and faithfully discharge the duties of the office upon which I am about to enter, to the best of my ability, so help me God.

"s/ Marvin Weatherford.
"Subscribed and sworn
to before me, this 11th
day of Feby—1947
"s/ J. C. English
"Judge of Probate Court,
"Coffee County."

If it be conceded that there was an omission or failure on the part of the commissioners to take the prescribed oath, which we by no means concede, this would furnish no sufficient ground for quashing

458

the indictment. It is well settled that objections going to the formation of a grand jury presenting the defendant must be made by plea in abatement before pleading not guilty, and after so pleading, any such objection is addressed to the irrevisable discretion of the trial court. Nixon v. State, 68 Ala. 535; Jackson v. State, 74 Ala. 26; Hubbard v. State, 72 Ala. 164; Vernon v. State, 239 Ala. 593, 196 So. 96; Ball v. State, 252 Ala. 686, 42 So.2d 626; Title 15, sections 278 and 285, Code of 1940.

Appellant also interposed a motion to quash the venire, summoned to try his case, and also a motion to continue the case based upon the same grounds as that supporting his plea in abatement to the indictment. Both motions were overruled without error. Section 46, Title 30, Code, provides: "No objection can be taken to any venire of jurors except for fraud in drawing or summoning the jurors."

The matter of continuance is within the discretion of the trial court. What we have said above clearly indicates that the trial court did not abuse his discretion in refusing to continue appellant's case.

Appellant further objected to striking from the list of jurors, from which had been stricken the names of jurors Harrison and Maddox. Both prospective jurors were shown not to have been resident householders or freeholders of Coffee County for the last preceding year. They were therefore subject to challenge for cause. Section 55, Title 30, Code. But whether challenged or not, it is the duty of the court to disqualify all jurors not having general qualifications. O'Rear v. State, 188 Ala. 71, 66 So. 81; Title 30, section 6, Code.

Counsel for appellant in brief state: "The court erred in not of his own motion excluding the testimony of witness Shoffeitt, giving his opinion as to the condition of the wounds inflicted before or after death, for the reason that the witness was not shown to be qualified as an expert upon the matters testified about. In that regard the record discloses:

"Q. Is it possible, Doctor, to determine whether those wounds were inflicted before, or after the pistol wounds?

"Mr. Boswell: We object to the question, if the court please.

"The Court: I don't see how he could. Sustain the objection.

"A. Yes, it is.

"Mr. Boswell: We move to exclude his answer.

"The Court: Yes, that answer is excluded, gentlemen of the jury. You won't consider it.

"Q. Was there any blood on or around the wounds on the man's face and head?

"Mr. Boswell: We object to the question, if the court please.

"The Court: Any blood around the wounds on his face?

"Mr. Paul: Yes sir.

"The Court: Overrule the objection.

"Mr. Boswell: We reserve an exception.

"A. There was a very slight amount of blood about the injured areas.

"Q. Is there any difference in the tissue around a wound that is made before death and one that was made after death? A. Yes, there is.

"Q. What would that difference be, Doctor? A. Well, a wound that is made in the body prior to death, that is while the heart is beating, will be indicated by a swelling of the area and a discoloration and what is called an interstitial hemorrhage, which is a bleeding of the ruptured blood vessels of the tissue. Now if the body is alive and the heart is beating when this injury is made, you will get that discoloration and swelling and the bleeding within the tissue itself. If the body is dead when a cut or wound is made in it, you don't get the interstitial hemorrhage in the tissue itself; you don't get the discoloration from the wound, or you do not get the swelling of the particular area if the body is dead and the heart is not beating.

"Q. Was there any swelling or discoloration around those wounds on his head or face? A. On the wounds about his head I noticed no swelling. There was only a slight hemorrhage about the wounds.

"Q. Would it, or not, be your opinion that he was, or was not dead at the time these wounds were inflicted on the head?

"Mr. Rowe: We object.

"The Court: Overruled.

"Mr. Rowe: We except.

"A. It is my opinion, at the time these wounds were inflicted on the head that the circulation had been greatly impaired. I would not say the body was dead, or alive, but certainly the circulation of the blood in the body had greatly been impaired and did not have the force that it would have on a normal live person.

"Mr. Boswell: We move to exclude the answer, because it was not responsive to the question.

"The Court: That is true. The answer is excluded.

"Mr. Rowe: We move that the jury be instructed not to consider it.

"The Court: The testimony of the witness in regard to that last question, gentlemen, is excluded from your consideration. You will not consider it."

Dr. Shoffeitt was qualified as an expert as follows:

"You are Paul Shoffeitt? A. Yes, sir.

"Q. Mr. Shoffeitt, what is your occupation? A. Associate Toxicologist, State of Alabama.

"Q. How long have you been employed by the Department of Toxicology? A. I have been there since 1940, with the exception between four and five years of that time was in the Army.

"Q. What is your duty with the Department of Toxicology? A. My duty includes making autopsies on bodies to determine cause of death, chemical analysis, microscopic analysis, spectroscopic and firearms ballistics examinations, general scientific examination of physical evidence.

"Q. And you have been doing that work since you have been with the department? A. Yes sir.

"Q. Will you tell us, please sir, what your educational background for that position is? A. I have B.S. degree in chemistry from Auburn. I have M.S. degree in chemistry with research in Toxicology at Auburn. I have completed approximately three years of the required work in law for a degree.

"Q. Do you have any other academic or practical experience that qualifies you for your position? A. None, other than the experience with the Department and the training that I have enumerated."

In our opinion, the witness was an expert qualified to answer the questions to which the trial court sustained objections, and that answers excluded could well have been left to the jury. We are not impressed that any error prejudicial to the right of appellant intervened in respect to that part of the record set out above.

■ Appellant complains of the trial court's refusal to permit appellant's witness Mrs. Wall to explain or state her reasons for not renting the land, which was the subject of the controversy between appellant and deceased, to deceased for the year 1950. The trial court did permit Mrs. Wall to testify that deceased offered her $200 more for the land and "I told him I couldn't do it," but sustained an objection as to her reasons why. The fact that Mrs. Wall rented the land to appellant and not to the deceased was material for the reason that the difficulty between appellant and deceased arose over that fact. We think that Mrs. Wall's reasons for doing so, whatever they might have been, were immaterial. Her mental processes in that regard could shed no light on the issue being tried. A showing of relevancy being absent, we will not put the trial court in error for rejecting the proffered testimony.

■ The receipt for $25 given deceased by Mrs. Wall on June 24, 1950, reciting "1950 land rent" was admissible. The signature of Mrs. Wall was in pencil and portions, or all, of the other figures and writings were in ink. Mrs. Wall testified that she signed it. Mrs. Whigham, wife of deceased, testified that she filled out the receipt in ink before the signature of Mrs. Wall was attached thereto.

Appellant complains of the bulldozing and abusive manner in which the circuit

solicitor cross examined appellant and some of his witnesses, giving their names and citing the record as to where such alleged tactics were used. We have examined each of them and are impressed that the conduct of such examinations was entirely proper.

In this connection appellant also complains of the introduction of photographs of the dead body of Whigham, and the solicitor's inquiry of appellant as to whether he wanted to object to looking at them. The rule relative to the admissibility of such photographs has been stated many times by this Court and the Court of Appeals. Recently in the case of Grissett v. State, 241 Ala. 343, 2 So.2d 399, and in the case of McKee v. State, 33 Ala.App. 171, 31 So.2d 656, certiorari denied 249 Ala. 433, 31 So.2d 662. Under these authorities the photographs were clearly admissible. With further reference to the photographs, the record discloses the following occurred on cross examination of appellant:

"Q. You had shot all the cartridges in there, hadn't you? A. I don't know.

"Q. You hit Mr. Whigham three times, didn't you? A. I don't know.

"Q. You heard the testimony concerning that, didn't you? A. Yes sir.

"Q. You saw the pictures? A. No sir, I haven't seen the pictures, and don't want to see them.

"Q. Would you have objection to looking at them? A. Yes sir.

"Q. Don't want to see them? A. No sir.

"Q. Could you say that you didn't hit him with more than three bullets? A. No sir, I couldn't say; I don't know."

No objection or protest of any kind was interposed to the cross examination set out above. If not clearly legal, the examination was entirely harmless.

Mrs. Wall, a witness for appellant, testified on direct examination that she had a conversation with the deceased on December 27, 1949, on her front porch and in the presence of some of her children, and one Mr. Adkinson, in which deceased told her, in substance, that he was going to tend the land in 1950 or die trying. Mr. Adkinson was called in rebuttal by the State. He testified, in substance, that he went with the deceased to Mrs. Wall's house one time and heard a conversation between Mrs. Wall and deceased concerning the land. Appellant objected to the witness testifying as to the conversation between Mrs. Wall and deceased, on the ground that the time the conversation occurred had not been fixed. We think the argument is hypercritical. From the record it is obvious that Mrs. Wall and the witness Adkinson were talking about the same conversation.

The trial of appellant consumed three days. The duties of one of the jurors required him to fire a boiler. The court, with the consent of the attorneys for appellant and the circuit solicitor, permitted this juror to go to his place of business accompanied by a bailiff, and before the court convened in the morning, to attend to those duties. Another bailiff remained with the other jurors. The jurors were thus separated during the course of the trial. The point was not raised in appellant's motion for a new trial.

In the case of Mitchell v. State, 244 Ala. 503, 14 So.2d 132, 135, it was said:

"In Davis v. State, 209 Ala. 409, 96 So. 187, 188, a trial for murder, was presented a situation quite analogous to the instant case. Said this court: 'Pending argument by attorneys, the jury were allowed to separate over night. This was done after consultation with the solicitor and defendant's counsel then of record, both consenting. The jury were strictly cautioned by the court with respect to their conduct during the separation, and with one accord the twelve deposed on defendant's motion for a new trial that they had had no communication whatever with any person concerning the case nor had seen any statement in the newspapers touching the case. By entering into this agreement the prosecution assumed the burden of proving that no abuse resulted from the separation of the jury; but in this case that burden has been well sustained and error can-

not be affirmed of the court's action in that behalf. Butler v. State, 72 Ala. 179.'

"Here is a clear announcement that consent of defendant's counsel to a separation of the jury is subject to his right, on motion for a new trial, to have the question of harmful effect investigated, with the burden on the state to prove no abuse resulted from the separation of the jury. * * *

"If the jurors be permitted to separate as here, under instructions from the court, with or without the consent of defendant, such separation is subject to challenge by motion for new trial, whereupon the burden is upon the state to clearly show no injury resulted from such separation."

■ If the court permits the jurors to separate, with the consent of the defendant or his attorneys, we know of no way to present the question, other than by a motion for a mistrial or for a new trial, and in which case the burden is on the State to clearly show that no injury to defendant resulted from the separation. The automatic appeal statute does not change that status. To hold otherwise would effectively deny the State the right and opportunity to show that no injury resulted to the defendant from the separation.

■ Appellant insists that the circuit solicitor and the assistant solicitor should not have been allowed to testify in the cause and to further prosecute the same. The rule governing such procedure is well stated in 70 Corpus Juris page 183, as follows: "Although a prosecuting attorney is competent to testify, his testifying is not approved by the courts except where it is made necessary by the circumstances of the case, and, if he knows before the trial that he will be a necessary witness, he should withdraw and have other counsel prosecute the case. The propriety of allowing the prosecutor to testify is a matter largely within the trial court's discretion. The testimony of a prosecuting attorney has been admitted where, unknown to the attorney before the trial, his testimony became valuable for the purpose of corroborating other witnesses in impeaching a defendant witness; to explain the surprise occasioned by the testimony of a witness called by the prosecuting attorney when such witness contradicts statements made to him previously; to show what happened while he accompanied an officer serving a search warrant; to establish a confession made to him in a case where there is no provisions of law for anyone else to conduct the trial; to show admissions made by defendant to him, and to establish facts occurring before a grand jury. So the prosecuting attorney may testify where the case is tried entirely by an assistant prosecuting attorney."

We are not prepared to say that the court abused its discretion in this regard.

■ Appellant argues that the court orally charged the jury that the burden of proof was on the defendant as to certain elements of self-defense. At the conclusion of the court's oral charge defense counsel called the court's attention to the fact that he had charged the jury that the burden of proof was on the State to show that the defendant was free from fault in bringing on the difficulty, but had not charged the jury with reference to the burden of proof as to the other elements of self-defense. The court stated, "I don't thing the burden is on the State as to the other two elements." Counsel for defendant then excepted to that part of the charge "that the burden of proof of these two elements was on defendant." The court replied, "I didn't charge that." Thereupon, in the language of appellant's counsel, "He then substantially correctly stated the rule," and we interpolate to the jury. As a matter of fact, the court never did charge the jury that the burden of proof was on the defendant as to the two elements of self-defense. He merely failed to charge in that regard and when called to his attention, he, as counsel says, correctly charged the jury as to the two elements of self-defense. We are clear to the conclusion that the minds of the jury were not left in a state of confusion in that regard.

Counsel for appellant earnestly insist on a reversal because of the prejudicial atmosphere in which appellant was tried.

462

They maintain that the courtroom was crowded with spectators and onlookers throughout the trial; that the spectators evinced their partisanship by jeering and laughing at the weak points in the defendant's case and cheering the strong points in that of the State. Appellant's motion for a new trial was, in part, based on this alleged display of partisanship. We have carefully examined the record and considered the evidence introduced in support of the motion for a new trial, and are fully convinced that nothing occurred during the course of the trial which was calculated to affect the minds of the jury in the performance of their solemn duty as jurors. We may also note here that our examination of the record and the evidence introduced on the hearing of the motion for a new trial does not convince us that the trial judge erred in denying the application for a change of venue.

Appellant's amended motion for a new trial was overruled. All of the questions presented by the motion for a new trial have been disposed of above, save one— newly discovered evidence. The newly discovered evidence consists of the testimony of one Mr. Charlie Walker and his wife, together with that of a Mrs. Wilkes. The testimony of these witnesses is to the effect that on the evening Whigham was killed, at or about the time the killing occurred, they passed the home of the deceased in an automobile and observed appellant and deceased in an apparent peaceful conversation. Appellant contends that the evidence of these witnesses tends to materially weaken that of the State's witnesses.

■ In the first place, the granting of a motion for a new trial on the basis of newly discovered evidence is addressed to the sound discretion of the trial court. Aaron v. State, 181 Ala. 1, 61 So. 812. In the second place, the overruling of a motion for a new trial based upon newly discovered evidence tending only to discredit the State's witnesses is not error unless upon the whole case it appears probable that the new evidence would change the result. Cosby v. State, 202 Ala. 419, 80 So. 803; Scruggs v. State, 224 Ala. 328, 140 So. 405.

■ Here the alleged newly discovered evidence does tend to impeach some of the State's witnesses, but it is also at total variance with appellant's version of the fatal difficulty. We do not believe that this evidence would have changed the result of appellant's trial.

We have carefully examined the record, as provided in Title 15, section 382(10), Code, and find nothing therein upon which we feel that a new trial should be granted.

Affirmed.

FOSTER, LAWSON, SIMPSON and STAKELY, JJ., concur.