61 So.2d 715

**REDWINE v. STATE.**

8 Div. 114.

Court of Appeals of Alabama.

Aug. 5, 1952.

Rehearing Denied Oct. 7, 1952.

Howell Thomas Heflin, Tuscumbia, for appellant.

Si Garrett, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., and Guin & Guin, Russellville, Special Counsel, for the State.

HARWOOD, Judge.

To an indictment charging him with assault with intent to murder this appellant plead not guilty, and not guilty by reason of insanity.

His jury trial resulted in a verdict of guilty.

At the call of the case in the court below the appellant filed a written motion for a continuance. The main and material grounds of this motion were that the appellant was at the time suffering from the effects of fractures to both arms and legs, one leg being in a cast, and was thus physically and mentally unable to stand trial, and was incapacitated to fully advise with his counsel during the trial.

It appears that these injuries were incurred while appellant was confined in jail. He climbed up the bars to his cell and jumped to the floor.

At the hearing on the motion Dr. Ralph O. Underwood, who examined appellant, testified that it would not "materially worsen" appellant's condition if he underwent trial, nor seriously endanger his health; that his present physical condition would not materially affect his present mental condition; and that appellant could be brought into court in a wheel chair "without any impairment to his condition."

No other evidence was submitted at the hearing on the motion.

The court denied the motion for a continuance.

The granting of a continuance is purely within the sound discretion of the trial court and his action in the premises will not be disturbed unless gross abuse of discretion appears. Maund v. State, 254 Ala. 452, 48 So.2d 553; Smith v. State, 35 Ala.App. 210, 45 So.2d 172. In Bryant v. State, 185 Ala. 8, 64 So. 333, the Supreme Court held that illness is not a cause for a continuance if an accused can be put to trial without interference with health.

Under the testimony of Dr. Underwood we can find no basis for interfering with the trial court's conclusions denying appellant's motion for a continuance.

The evidence presented by the State tends to show that this appellant and Miss Gertrude DeVaney had been friends for five years, and in fact were engaged at one time. This engagement was broken off about two years ago, though the couple apparently remained on friendly terms.

About 8:30 A. M. on the day in question Miss DeVaney drove to the house where appellant was temporarily staying for the purpose of taking him to her home. It was expected that some of appellant's relatives would call for him that afternoon at Miss DeVaney's home.

After they had driven a short while appellant asked Miss DeVaney to drive him out into the country to pay a man some money he owed. When they neared the place they were going the appellant stated he had decided not to make the payment.

They then started on the return drive to Miss DeVaney's home. Appellant had appeared perfectly normal during this time.

When the intersecting road leading to Miss DeVaney's home was reached the appellant grabbed the stearing wheel and prevented Miss DeVaney from making the turn to the left. The appellant placed his

foot over Miss DeVaney's foot on the accelerator and pushed down with such force that her foot was bruised thereby. She was unable to extract her foot, and a wild ride ensued with Miss DeVaney attempting to stop the car with her other foot and also with the hand brake.

Eventually she succeeded in getting the car stopped. Then, according to Miss DeVaney:

"A. Yes, when I got the car stopped, I asked him what on earth was the matter and he said he was going to kill me. He was right in my face with his hand on my face, and I believe he struck me on the head. When I got the car stopped, he knocked me against the door.

"Q. Do you remember saying anything about the car? A. Yes, I told him he could have the car and go anywhere he wanted to; he could have it, but not to kill me. I hadn't done anything; I was trying to help him and he kinda laughed.

"Q. Do you know how long it took you to stop the car, or what distance? A. It took me a good little distance; I don't know. I tried once and it slid across the road; I couldn't get control of it; it slid back or jumped over and I finally stopped it."

After she had gotten out of the car, or had been pushed therefrom, Miss DeVaney saw a man about 150 yards away. She called to him for help, and attempted to run to him but the appellant held her.

We interpolate here that this man, Frank Carlisle, witnessed this part of the struggle and heard appellant's cries for help. However instead of going to Miss DeVaney's assistance he went back into his house and told his wife that "a man and woman was in a fight and the woman was hollering for help; I stepped to my neighbor and called the police." Carlisle did not approach the scene until after the officers had arrived.

After Miss DeVaney was out of the car the appellant pushed her over the road embankment and she fell into some sort of a hole at the bottom thereof. The ap-

pellant jumped in after her. He again told her he was going to kill her after picking up a "rough looking rock." The following excerpt from Miss DeVaney's testimony discloses the completion of the attack as follows:

"Q. Did he raise the rock up? A. Yes sir.

"Q. And come down with it? A. Yes, I felt the lick on my head.

"Q. Which side of the head? A. The right side.

"Q. Was it above the ear? A. Yes, right in there (indicating) was the biggest lick.

"Q. Do you know whether he hit you more than one time? A. I believe he did, but I was so near out; I believe he hit me on top of the head too.

"Q. You know he hit you on the side of the head?"

Thereafter appellant fled from the scene but was later apprehended as he stood in a creek about knee deep. Upon approach of the officer the appellant threw himself face downward in the water but was pulled therefrom by the officer.

Several witnesses gave testimony tending to corroborate various phases of Miss DeVaney's testimony. We do not see that the testimony of these witnesses will throw any additional light on the facts delineated in Miss DeVaney's testimony, and therefore will not set out such additional evidence.

The injuries inflicted by the blows on Miss DeVaney's head were serious and permanent. Her skull was fractured and it was necessary to remove a part thereof, as well as some of the brain tissue. For several days it was doubtful that she would live.

During the presentation of the State's case two statements, confessory in nature, made by the appellant were received in evidence over appellant's objection.

There can be no doubt that the usual predicate was laid prior to the introduction of these statements, that is that there were no threats made, nor promise or hope of

reward, etc. held out, by any of the parties present at the time the statements were made.

Appellant's counsel however insisted in his objections on the grounds that first, it was not established that persons other than those present may not have threatened appellant, or offered rewards or promises prior to the time the statements were made, and second, that appellant was insane at the time the statements were made, and they were therefore involuntary for this reason. In this connection appellant's counsel requested that he be allowed to take on voir dire examination the witnesses through whom the statements were sought to be introduced in order to establish appellant's mental condition at the time the statements were made.

This motion was denied by the court who permitted the introduction of the statements, after the usual predicate of voluntariness had been shown by the State's witnesses.

■ No merit attaches to the first ground of objection. As stated in Logan v. State, 251 Ala. 441, 37. So.2d 753, 755, "It was the right of the accused to controvert the predicate evidence preliminary to the introduction of the confession by cross-examination of the State's witnesses or by evidence aliunde, *but the State, having established by the preliminary proof the voluntary nature of the confession, was not required to examine every witnes! present when the confession was made or to array for interrogation every person who might have had access to or conversation with the prisoner during his incarceration* in order to remove the prima facie presumption of involuntariness."

The second ground of the objection going to the introduction of the confessory statements, asserting their involuntariness because of the mental capacity at the time the statements were made, and denying appellant's request to examine on voir dire, presents a proposition not often raised.

It is true that a general statement is often found to the effect that in the absence of total insanity, neither the voluntary character of a confession nor its admissibility is affected by the mental instability of the person making it, such mental condition being for consideration by the jury in determining the weight of the confession. See McAffee v. United States, 72 App.D.C. 60, 111 F.2d 199, and cases therein cited. And in Vinzant v. State, 28 Ala.App. 220, 180 So. 736, 737, the late Judge Rice wrote: "The rule in such matters was, we believe, correctly stated by us in our opinion in the case of Smith v. State, 25 Ala.App. 297, 145 So. 504, 505, to wit: 'Intoxication (or, we interpolate, other mental aberration) less than mania does not exclude a confession made during its continuance; if claimed and proved, it only goes to the weight and credibility to be accorded by the jury to the said confession.' And see the authorities we cited in the opinion referred to."

It appears however that in the opinions in which the general statement above referred to is made that actually evidence tending to establish the mental condition of the accused at the time the statements were made had been introduced, nor had any demand for a voir dire examination been made.

■ A case most directly in point that our research has revealed is State v. Berberick, 38 Mont. 423, 100 P. 209, wherein the Supreme Court of Montana held that it was error to admit in evidence a confession of an accused without permitting him the demanded opportunity of showing that he was of unsound mind when it was made.

■ We think the above enunciated doctrine to be sound. When a confession is admitted an accused is in effect testifying. His capacity as a witness is therefore involved. Capacity as a witness is presumed, and to exclude a witness because of mental or moral incapacity such defect must be made to appear. This the appellant sought to do by voir doir examination. The determination of the capacity of a witness is always for the judge, and upon a suggestion of incapacity by objection raised, and the additional request to determine the capacity of the accused by voir doir, as was done in this case, should

have been accorded. See Wigmore, Evidence, 3rd Ed. Vol. II, Sec. 497.

We are however unwilling to reverse this case because of the erroneous ruling in this premise. The statements of the accused which were admitted were merely to the effect that he had hit Miss DeVaney with a rock, and he did not know why he had done so.

These facts were testified to by Miss DeVaney in far more detail, and were without dispute. A large bloody rock found at the scene of the assault was received in evidence. Miss DeVaney was corroborated in many parts of her testimony by other witnesses. Such extraneous facts corroborated the appellant's statements fully and reasonably tended to exclude any idea of fabrication. Under such circumstances the statements were admissible. Moss v. State, 19 Ala.App. 85, 96 So. 451; Gregg v. State, 106 Ala. 44, 17 So. 321. Further, we cannot see that the admission of the statements could probably have affected the substantial rights of the appellant. Sup.Ct. Rule 45, Code 1940, Tit. 7, Appendix.

The defense presented as a witness Mr. George J. Green, Veterans Service Officer for Lauderdale County.

Mr. Green testified that he had known appellant for approximately four years; that on 14 May 1951 the appellant came to his office about noon and remained there for approximately thirty minutes.

The appellant told Mr. Green he wanted some letters written. Mr. Green's secretary being out he asked appellant if he could not wait until 1:00 o'clock P. M., appellant stated that would be too late. Green then wrote the letter in long hand. According to Mr. Green the appellant was very nervous, would get up during the interview and look out of a window, and he did not understand what appellant meant in the letter he wrote for him. That appellant stated that he had been in a hospital in Tuscumbia and some one had tried to poison him; he had been given lots of medicine, and he figured he was being doped and that the medicine would kill him. He refused to take the medicine, and instead had drunk about a gallon of water and was feeling better; that while in the hospital he had tried to telephone some one, but "they gave him the wrong number" and he was unable to get a taxi, so he had just gotten up and walked out of the hospital.

After the above testimony the record shows the following:

"Q. From what you saw of him at that time and from the statements he made, in your opinion was he sane or insane?

"The State objects because it is illegal, irrelevant, incompetent and immaterial, and the witness is not qualified, or well enough acquainted with him to form an opinion.

"By The Court: Was that your only contact with him on that particular occasion?

"A. On that particular occasion, yes.

"Objection sustained, Defendant excepts."

It will be noted that while Mr. Green testified that he had known appellant some four years, there was no testimony by him as to how often he had seen the appellant, or how well he had known him during this period. For aught appearing the acquaintanceship may have been most casual. It is further to be noted that the question seeking Green's opinion as to appellant's sanity was limited to the occasion of his thirty minute visit on 14 May.

In Braham v. State, 143 Ala. 28, 38 So. 919, 924, it was held that an objection was properly sustained to a question seeking a lay witness' opinion as to the sanity of an accused after it was shown that the witness, a newspaper reporter, had gone to the accused's cell the night of a killing and had talked to him for three quarters of an hour. The witness testified that during this time the accused seemed to be cool, but nervous; that he could not get much sense out of him; that his actions were very peculiar, and what he got from the accused he had to pull from him; that defendant would repeat things he had already said, and several times asked witness to leave, saying he wanted to read some letters.

Writing to the court's action in sustaining the objection seeking witness' opinion as to the accused's sanity, the court stated:

"By numerous decisions of this court it has been held that a nonexpert witness, before he may be allowed to give his opinion of the existence of an unsound condition of mind, must be shown to have had the opportunity to form a judgment, and this would depend upon the familiarity of the witness with the person whose sanity is in question, 'the character of the disqualification, the nature and number of the extraordinary circumstances detailed, and their proximity to the act involved in point of time.' The witness was not shown to have had any previous acquaintance with the defendant. He had never seen him before the night of his interview with him. We think he was not brought within the rule allowing the opinions of nonexperts as to the insanity of a person. Florey's Executors v. Florey, 24 Ala. 241; Norris' Case [Norris v. State], 16 Ala. 776; Powell's Case [Powell v. State], 25 Ala. 21; Stubbs v. Houston, 33 Ala. 555; Burney v. Torrey, 100 Ala. 157, 14 So. 685, 46 Am.St.Rep. 33; Parrish's Case [Parrish v. State, 139 Ala. 16, 36 So. 1012], supra; O'Connor v. Madison, 98 Mich. 183, 57 N.W. 105. Furthermore, as was held in Parrish's Case, supra, to the question, as to the competency of a witness to express an opinion as to the insane condition of the defendant's mind is a question for the court, and not for the jury; and the court's decision as to the question will not be revised unless it is clearly made to appear to have been erroneous. It follows that there was no error in the court's ruling upon the objection made by the state."

To the same effect is the holding in Odom v. State, 172 Ala. 383, 55 So. 820, where the lay witness whose opinion was sought had talked with the defendant " 'several months ago for about a half hour.' "

It is our conclusion therefore that under the above authorities as applied to the instant facts fully justified the court's ruling in the premises.

Mr. W. L. Bates, deputy sheriff and jailor of Franklin County, was called as a rebuttal witness as to appellant's sanity. Mr. Bates testified he had known appellant for thirty years, and during the last four years had seen and talked with appellant frequently. The last time was about three weeks before this alleged offense. At no time prior to this offense had he observed anything abnormal about appellant, and this witness expressed the opinion that appellant was sane prior to the offense.

The record shows that this witness was examined further as follows:

"Q. Now, after he was placed in jail, did you talk to him frequently? A. Yes, most every day.

"Q. At any time since he has been in jail, have you seen anything in his demeanor or conduct or actions that would indicate an abnormal mind? A. Well, I have seen him do different things while he was in jail.

"Q. Well, do you have an opinion since he has been in jail as to whether or not he was sane or insane?

"The defendant objects because the proper predicate has not been laid. It is illegal at the present time in the method he is asking it.

"By the Court: If he has an opinion, he can state it, objection overruled. Defendant excepts.

"Q. Do you have an opinion as to whether he has been sane or insane in jail? A. Yes, I have an opinion that he is sane."

Counsel for appellant contends that when the witness stated he had "seen him do different things while he was in jail" that he should then have been required to detail these "things" before being permitted to express an opinion as to appellant's sanity.

The rule has repeatedly been stated that non-expert witnesses may give an opinion as to the sanity of a person inquired of after they have first denied generally the existence of any facts showing

an abnormal state of mind, and without specifying any particular facts. George v. State, 240 Ala. 632, 200 So. 602; Wise v. State, 251 Ala. 660, 38 So.2d 553, and cases cited.

 While the witness' answer that he had "seen appellant do different things" might fall short of a general denial of abnormality of appellant's conduct within the technical language of the rule, yet taken in the full context of Bates' testimony it could reasonably be construed as a statement by Bates that although he had seen appellant do "different things," he was yet of the opinion that he was sane. The extent of the qualification of non-expert witnesses as to mental condition of another is largely in the judgment of the trial court, who is not bound by any hard and fast rule. Wise v. State, supra. We are unwilling to cast error upon the trial court because of his ruling in this instance, particularly since the witness was later examined in detail as to the "things" he had observed appellant do while in jail, and the jury thus had the benefit of this evidence in weighing Bates opinion as to appellant's sanity. Sup.Ct. Rule 45.

Through Miss Shirley Brown, custodian of records at the Eliza Coffee Memorial Hospital in Florence, the defense introduced the medical records of appellant while he was a patient in the hospital from May 9th through May 14, 1951.

These records show that the appellant was admitted to the hospital at his own request, and that after refusing to take various medicines prescribed and proving thoroughly uncooperative he decided, on advice of his physician, to go to a Veterans Administration Hospital, and left with that intention.

The primary diagnosis made in the hospital was (1) Irritability of colon, and (2) Intestinal neurosis.

These notes also show that at the time of his admission the appellant was rather tense and nervous, and that during his stay in the hospital he thought that a bromide administered had poisoned him. The notes also bear a statement by appellant's physician that "This man has been a chronic neurotic and hypochondriac for years. His chief pursuit has been a government pension which he recently obtained."

The record shows the following during the cross examination of Miss Brown:

"Q. Do you know what neurosis is? A. No sir.

"Q. You don't know anything on that chart, do you that indicates that he was insane?

"Defendant objects because she is not qualified. Objection overruled. Defendant excepts.

"A. I don't know what was wrong with the man except the final diagnosis of the man.

"Q. I am asking you with reference to the working diagnosis? A. Neurosis is usually a mental condition; there are many types.

"Q. Do you know whether I am subject to neurosis or not?

"Defendant objects because she isn't qualified to answer that. Objection overruled. Defendant excepts.

"A. No, I don't know.

"Q. You wouldn't know what degree of neurosis I have? A. No sir.

"Q. And you wouldn't know what the expression 'spastic colon' means? A. No sir."

 During her entire examination Miss Brown had by her answers indicated that she merely kept the records, and refused to enter into any dissertation as to their meaning. She was of course not shown in any way to be qualified to answer the questions addressed to her as shown by the above excerpt. The objections thereto should have been sustained. Her answers however were completely innocuous, and we do not see how appellant could have suffered any injury therefrom. No reversal can reasonably be posited on this instance. Sup.Ct. Rule 45.

During the redirect examination of Mrs. Kate Burns, a witness for the defense, the record shows the following:

"Q. When Mrs. Jackson brought him back what were the plans? A. It seems they were getting ready to send

him to the hospital when I went to work that morning. The last he said was, 'I am going to Memphis to the hospital.'

"The state objects because it is illegal, irrelevant, incompetent, immaterial and hearsay. Objection sustained. Defendant excepts."

██ This conversation had taken place some three or four days before this offense. Its probative value was therefore negligible.. Regardless, the record shows that the State's objection was interposed and sustained *after* the answer had been made. The answer was not excluded. The appellant had the full benefit of this testimony, and it was not excluded. The matter was not further pursued. Actually there is nothing to review on this point.

Mr. M. C. Giles, publisher of the Franklin County Times, and his photographer went to the scene of this offense at 8 A. M. on Sunday morning following its commission. They made a photograph depicting the scene and showing skid marks on the highway.

The appellant objected to the introduction of this photograph on the grounds that it was not shown that it was a representation of the skid marks as they were at the time they were made. The court overruled the objection and the photograph was admitted in evidence. However, this exhibit does not appear in this record, nor was it forwarded to this court.

██ Without intimating that any merit whatsoever attaches to appellant's contention of error based on the admission of this exhibit, See McKee v. State, 253 Ala. 235, 44 So.2d 781 we are unable, in its absence, to pass upon the ruling of the court admitting it in evidence. Swindle v. State, 27 Ala.App. 549, 176 So. 372; certiorari denied 234 Ala. 621, 176 So. 375.

Charges 1 and 3 were refused without error. The court delivered an excellent and adequate oral charge covering the defense of insanity. Taking this charge as a whole it is our conclusion that it fully covered the principles enunciated in the above mentioned refused charges.

Affirmed.

## On Rehearing.

Appellee has filed a motion to strike appellant's application for rehearing because the application was not written on transcript or folio paper, but on legal cap paper.

Appellee contends that his motion must be granted because of the provisions of Supreme Court Rule 36, the pertinent provisions of which are as follows:

"All applications to this court to admit bail, or for the writ of habeas corpus, mandamus, or *other writ or process* depending on motion of this court, * * *, shall be presented on folio paper, of the pattern now required by the rule for ordinary transcripts, so that the same may be in suitable form for binding; and no application shall be heard that is not so presented." (Italics ours.)

██ The word "process" as used in the rule, supra, is used in its ordinary legal sense, which renders it synonymous with "writ." See Parks v. Bryant, 132 Ala. 224, 31 So. 593.

While the verbiage found in applications for rehearings is often in the language of a motion, we do not think that the true character of an application can be altered by such draftsmanship.

██ An application for rehearing amounts to merely a friendly suggestion to an appellate court informing it of possible errors in its rendered opinion. 4 C.J.S., Appeal and Error, § 1428.

██ An application for rehearing is not entered on the records of a court unless so ordered. 4 C.J.S., Appeal and Error, § 1430.

██ Furthermore, this court may of its own motion, during the term, restore a cause to the rehearing docket for further consideration. Kinney v. Pollak, 225 Ala. 229, 142 So. 390.

██ An application for rehearing is not a writ or process, depending on motion of this court, required to be on folio paper under the terms of Rule 36, supra.

Certainly nothing in the provisions of Supreme Court Rule 38, pertaining specifically to applications for rehearing, can be

deemed to require that such applications be on folio paper.

Even in its technical legal aspects we find no merit in appellee's contention.

 Further, examination of the records of this court (and we might add, of the Supreme Court) reveal that through the years, it is rare that an application for rehearing its filed on folio paper. These applications written on legal cap paper have continuously and through all the years been received and considered by both courts. Such historical practice, procedure and custom should not be overturned without fair warning to the practicing bar, even if appellee's motion contained merit, which we think is lacking under any theory.

Appellee's motion to strike appellant's application for rehearing is therefore denied.

Upon consideration of appellant's application for rehearing, we are likewise of the opinion that it too is without merit, and that the points raised therein were adequately covered in our original opinion. Appellant's application for rehearing is therefore denied.

Appellee's motion to strike appellant's application for rehearing denied.

Appellant's application for rehearing denied.