Richard Jason Layton was convicted in the Tallapoosa Circuit Court of first-degree sexual abuse. The Alabama Court of Criminal Appeals affirmed his conviction and sentence in an unpublished memorandum. Layton v. State (No. CR-03-1093, Sept. 24, 2004),___ So.2d ___ (Ala.Crim.App. 2004) (table). We granted Layton's petition for a writ of certiorari to address his claim that newly discovered evidence mandates a new trial.
 I. Facts and Procedure
In March 2003, Layton spent the night at a hunting camp with C.M. and C.M.'s two children. On the evening of their first day at the camp, Layton and J.M., C.M.'s daughter, were riding a four-wheeled all-terrain vehicle ("ATV") together, while C.M. and his son were riding together on another ATV. The ATV on which C.M. and his son were riding was equipped with a headlight, while the one on which Layton and J.M. were riding was not. C.M. testified that, because their ATV had the light, C.M. and his son rode in front of Layton and J.M., and that, several times, Layton and J.M.'s ATV turned off the path on which they were all riding. C.M. testified that Layton, who was driving the ATV, did *Page 1054 
this so many times that C.M. told him to stop falling behind. Layton denied ever separating the ATV on which he and J.M. were riding from the ATV on which C.M. and his son were riding. J.M. testified at trial that, while they were riding the ATV, Layton touched her between her legs more than once.
That night at the hunting camp, Layton slept in a tent with C.M. and both of C.M.'s children, including J.M. Layton claimed at trial that C.M. had invited him to sleep in the tent and that he accepted because he was muddy and did not want to dirty the trailer used for sleeping at the hunting camp. C.M. testified that Layton requested to sleep in the tent because he did not want to get the trailer dirty or to wake the people sleeping in it, but that, after C.M. agreed to allow Layton to sleep in the tent, Layton went into the trailer anyway to retrieve his sleeping bag.
Layton slept beside J.M. that night in the tent. J.M. testified that she awoke in the middle of the night to find Layton's hand inside her underwear. She also testified that she then moved to the other side of her father because she did not want Layton to touch her again. C.M. testified that, around 6:00 a.m. the next morning, J.M. climbed on top of him, trembling. C.M. also testified that, later that morning when Layton spoke to J.M., she would not respond.
Layton denied having had any sexual contact with J.M., and he claimed that he had touched J.M. while they were on the ATV only to keep her from falling off. During the incident at the hunting camp, C.M. and his wife, who initially reported the abuse to the authorities, were in the process of getting a divorce. Layton testified that, at one point, C.M. told him that he believed his wife had fabricated the allegations. Multiple witnesses at trial testified to Layton's honesty and good character.
Debbie Breckinridge, a forensic interviewer for the TriCounty Advocacy Center, testified that J.M. told her of the alleged abuse.[1] For the most part, J.M.'s account of the events as related to Breckinridge was consistent with J.M.'s testimony at trial, although J.M. did tell Breckinridge that Layton also touched her in the breast area, an occurrence that J.M. did not mention during her testimony at trial. Breckinridge admitted that when she interviewed J.M. she was unaware of the marital discord and alleged domestic abuse that had occurred between C.M. and his wife and that such events, generally speaking, can impact her assessment of a child's allegations.
The jury returned a guilty verdict, and the trial court sentenced Layton to eight years' imprisonment. Upon reviewing the victim-impact statement during the sentencing hearing, the defense discovered that J.M. had been under psychiatric care and on medication before the incident at the hunting camp. Layton moved for a new trial on the basis of that newly discovered evidence, and the trial court set a hearing on his motion. Layton subpoenaed J.M.'s medical records, which, according to Layton, showed that, before the incident at the hunting camp, J.M. had undergone psychiatric treatment and had been prescribed Zoloft and Wellbutrin as well as Adderall and Ritalin.[2] *Page 1055 
At the hearing on Layton's motion for a new trial, the defense presented letters from two doctors who had reviewed J.M.'s medical records. The first letter was from Dr. Kaycia Vansickle. Dr. Vansickle concluded that J.M. had been diagnosed with obsessive-compulsive disorder and with depression and that she had symptoms of attention-deficit/hyperactivity disorder and paranoia. Based on these findings, Dr. Vansickle was of the opinion that J.M. "would have a serious credibility problem . . . as a witness." The second letter was from Dr. Vonceil Smith. Dr. Smith had also reviewed J.M.'s medical records and noted "at least two references to episodes of deceit by J.M.," although Dr. Smith refused to give her opinion on the credibility of J.M.'s allegations, without further investigation. The trial court denied Layton's motion for a new trial.
Layton appealed to the Court of Criminal Appeals, arguing that the trial court erred in denying his motion for a new trial based on the newly discovered evidence of J.M.'s medical records. The Court of Criminal Appeals held that the new evidence was merely impeaching and that the trial court therefore did not err in denying Layton's motion for a new trial. We granted Layton's petition for a writ of certiorari to determine whether the Court of Criminal Appeals erred in upholding the circuit court's denial of Layton's motion for a new trial.
 II. Standard of Review "`"The appellate courts look with disfavor on motions for new trials based on newly discovered evidence and the decision of the trial court will not be disturbed absent abuse of discretion." Further, "this court will indulge every presumption in favor of the correctness" of the trial judge's decision. The trial court is in the best position to determine the credibility of the new evidence.'"
Ex parte Heaton, 542 So.2d 931, 933 (Ala. 1989) (quoting Isomv. State, 497 So.2d 208, 212 (Ala.Crim.App. 1986)).
 III. Analysis
The Court of Criminal Appeals held that Layton's newly discovered evidence was "merely impeaching" and that the trial court therefore did not err in denying the motion for a new trial. In Heaton, 542 So.2d at 933-34, this Court stated:
 "To establish a right to a new trial based on newly discovered evidence, the petitioner must show the following: (1) that the evidence will probably change the result if a new trial is granted; (2) that the evidence has been discovered since the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence;[3]
(4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching. While all five requirements ordinarily must be met, the law has recognized that in certain exceptional circumstances, even if the newly discovered evidence is cumulative or impeaching, if it appears probable from looking at the entire case that the new evidence would change the result, then a new trial *Page 1056 
should be granted. This Court in Slaughter v. State, 237 Ala. 26, 185 So. 373 (1938), recognized the exception as follows:
 "`The authorities generally recognize the rule that ordinarily such impeaching or contradicting testimony does not suffice for a new trial, though there are exceptional instances where such proffered proof may justify a reconsideration of the cause.'
 "Id., 237 Ala. at 27, 185 So. at 373 (emphasis added). Those exceptional circumstances subsequently were defined by this Court in Maund v. State, 254 Ala. 452, 48 So.2d 553 (1950).
 "`[T]he overruling of a motion for a new trial based upon newly discovered evidence tending only to discredit the State's witnesses is not error unless upon the whole case it appears probable that the new evidence would change the result.'
 "Id., 254 Ala. at 462, 48 So.2d at 562 (citations omitted) (emphasis added).
 "We recognize the existence of recent caselaw that seems to reject the exception for newly discovered cumulative or impeaching evidence that would probably change the result of a trial. See, e.g., Isom v. State, 497 So.2d 208 (Ala.Crim.App. 1986); Baker v. State, 477 So.2d 496 (Ala.Crim.App. 1985); and Bland v. State, 390 So.2d 1098 (Ala.Crim.App. 1980). Those cases seem to hold that cumulative or impeaching evidence will never establish a right to a new trial. However, it is evident that in each of those cases, the newly discovered evidence, when viewed in light of the other evidence presented at trial, most likely would not have changed the result. Therefore, a new trial under those circumstances would be unjustified. However, those cases should not be taken as precluding a new trial on the basis of newly discovered evidence simply because the new evidence is cumulative or impeaching, if that evidence would probably change the result if a new trial were granted."
(First emphasis added; some citations omitted.) While Heaton
involved a defendant's motion to withdraw his guilty plea, the Court stated that it was applying the standard applicable to motions for a new trial based on newly discovered evidence.
If it is not probable that the newly discovered medical records and the letters from the doctors evaluating those records would have changed the result at trial, the trial court correctly denied Layton's motion for a new trial. Because the trial court would have been within its discretion in ruling that the newly discovered evidence was inadmissible at trial, we cannot conclude that the evidence probably would have changed the result at trial. See Houston v. State, 208 Ala. 660, 663, 95 So. 145, 147
(1923) ("The trial court will not, of course, be put in error for refusing a new trial because of newly discovered evidence when such evidence would not be admissible upon a retrial of the cause.").
 A.
Dr. Vansickle's letter states:
 "As we discussed, I have reviewed Dr. Stewart Waddell's records involving [J.M.], and I am concerned that you did not have access to these records prior to Mr. Jason Layton's trial. These records indicate a psychiatric history that clearly predates the event for which Mr. Jason Layton was tried. Dr. Stewart Waddell's records indicate that [J.M.] had some clear symptoms of attention deficit hyperactivity disorder from kindergarten on, and behavioral problems that have occurred from kindergarten on. These clearly predate the event for which Mr. Layton was tried. Dr. Waddell's *Page 1057 
original evaluation of [J.M.] occurred on October 24, 2002, several months prior to this event. He found at that time that she also had major depressive disorder, severe and recurrent, given her suicidal remarks secondary to the parents' divorce. He called it adjustment disorder at the time, but in a later note reported it as major depressive disorder, severe and recurrent, secondary to the suicidal remarks she had made prior to the event for which Mr. Jason Layton was tried.
 "This child was diagnosed with obsessive-compulsive disorder, which is fairly severe given the condition of her hands in his first report; they were quite chapped, and the obsessive-compulsive handwashing was a noticeable problem. He also reported on his initial exam that she was historically found to have some slightly slow developmental features, but her motor and speech skills had normalized.
 "This information would clearly have made a difference in the credibility of this child as a witness. The fact that there is also some paranoia involved in a couple of her exams prior to March of 2003 would indicate a serious credibility problem with this child as a witness. It would certainly be in order to request accommodation by the court, or that the court reopen this situation given the new information presented to you."
Dr. Vansickle does not explain why a child with attention-deficit/hyperactivity disorder, depression, obsessive-compulsive disorder, slightly slow developmental features, and "some paranoia" might be prone to lying, either in her testimony or in her initial report of the incident. She also fails to cite any scientific research, testing, or any other studies that indicate a child with these problems would fabricate such allegations as those involved here or that such a child might falsely perceive this type of abuse. Without any scientific support, her letter is nothing more than a mere assertion of her belief.
In Slay v. Keller Industries, Inc., 823 So.2d 623, 626 (Ala. 2001), we stated: "`[A] person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the expert is testifying.'" We also stated in Slay that "[m]ere assertions of belief, without any supporting research, testing, or experiments, cannot qualify as proper expert scientific testimony under either the `general-acceptance' standard enunciated in Frye [v. UnitedStates, 293 F. 1013 (D.C. Cir. 1923),] or the `scientifically reliable' standard of Daubert [v. Merrell Dow Pharmaceuticals,Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)]."823 So.2d at 626. Dr. Vansickle's letter fails to comply with either the standard enumerated in Frye or the standard enumerated in Daubert.
Additionally, Layton does not demonstrate that Dr. Vansickle is qualified to testify as to whether J.M. may have fabricated the allegations against him, or whether J.M. might have had problems correctly perceiving what allegedly occurred on the night in question. Although Layton states in his brief that Dr. Vansickle is a psychiatrist, our search of the record does not reveal any other qualifications that might be relevant. Cf. Inmon v.State, 585 So.2d 261, 267 (Ala.Crim.App. 1991) (holding that the trial court did not err in admitting, for purposes of proving the truth of a child's sexual-abuse allegations, the testimony of a psychiatrist who "had been practicing adolescent psychiatry for16 years, had worked with 400-500 sexually abused children, andhad become `familiar with the patterns and symptoms of a childwho has been sexually *Page 1058 abused.'"). The trial court would have been within its discretion in ruling that Dr. Vansickle's letter was inadmissible. See Central Aviation Co. v. Perkinson,269 Ala. 197, 203, 112 So.2d 326, 331 (1959) ("[A]n expert may not testify to his opinion on matters outside of his field of training and experience."). We cannot conclude that Dr. Vansickle's letter would have probably changed the result at trial. See generallyHouston, supra. Therefore, Layton is not due a new trial based on Dr. Vansickle's letter.
 B.
The other letter, written by Dr. Vonceil Smith, states:
 "In response to the referral question, there are major documents whose availability would have been imperative to adequately assist in the preparation for your case. Documents I feel are likely relevant, but unavailable include: A) transcripts from the forensic examiners sessions with the alleged victim, B) all prior treatment notes (pediatrician, therapist, psychiatrist), C) school records including disciplinary actions and patterns of attendance, and D) psychometric test data if available. From the information provided there are several interesting points. Specifically, there are at least two references to episodes of deceit. Additionally, there are references made to her paternal relationship. I am uncertain whether or not the forensic examiner of record was made aware of the extent of the witness's treatment.
 "Consequently, given the available data I am unable to offer an opinion of the witness's most likely state of mind at either the time of initial complaint or at the time of testimony. As I indicated there are lines of research directed toward eyewitness testimony and the external validity of memory. I am unable to offer any explanation to you of the likely effects of the witness' medication assuming medication compliance."
(Emphasis added.) Because Dr. Smith refuses to express an opinion as to whether J.M. was being truthful in making the allegations against Layton or whether J.M. may have had a problem in correctly perceiving her surroundings, we cannot say that her letter would have probably changed the result at trial. SeeHouston, supra; Rule 403, Ala. R. Evid. (allowing the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, of confusing the issues, or of misleading the jury). In any event, even if Dr. Smith's letter had been admissible at trial, it is not probable that it would have changed the result, considering Dr. Smith's refusal to express her opinion. Therefore, Layton is not due a new trial on the basis of this evidence.
 C.
J.M.'s medical records are difficult to decipher, but, according to Layton, they show that she was on various medications, including Ritalin, Wellbutrin, Zoloft, and Adderall. According to Dr. Vansickle, the records also show that J.M. suffered from various psychological disorders. Assuming for the sake of reviewing the trial court's ruling that Dr. Vansickle's analysis of what the medical records reflect is correct, without a legally admissible expert opinion, based on scientific study, explaining the significance of the medications and showing that J.M.'s alleged disorders and medication might cause her to falsely report the alleged abuse, the medical records themselves do not support a conclusion that had they been introduced into evidence the result at trial would probably have been different. See Houston, supra; Rule 403, Ala. R. Evid. *Page 1059 
 IV. Conclusion
The trial court did not err in denying Layton's motion for a new trial based on the newly discovered evidence. The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
NABERS, C.J., and SEE, HARWOOD, WOODALL, STUART, SMITH, and BOLIN, JJ., concur.
PARKER, J., concurs in the result.
[1] According to Breckinridge, the TriCounty Advocacy Center investigates allegations of child abuse in Chambers, Tallapoosa, and Randolph Counties and arranges for forensic interviewers to interview the alleged victims and assess the allegations.
[2] We note that Zoloft and Wellbutrin are most often used to treat depression, while Adderall and Ritalin are commonly prescribed for attention deficit disorder.
[3] The State contends that Layton's failure to examine J.M. about the effects on her of her parents' divorce resulted in his failure to pursue a line of inquiry that would have elicited evidence of J.M.'s mental state at the time of the alleged abuse. Neither the State nor Layton was aware of the information concerning J.M.'s mental state until after the trial. The Court of Criminal Appeals did not address this issue in its unpublished memorandum, and we dispose of this appeal on the assumption that Layton exercised due diligence to discover such evidence.