Kenneth James Jackson was tried and convicted of capital murder in Jefferson County, Alabama. In a vote of 11 to 1, the jury recommended the death penalty, and, following a sentencing hearing, the trial court sentenced Jackson to death. The Court of Criminal Appeals affirmed the conviction and sentence.Jackson v. State, 674 So.2d 1318 (Ala.Crim.App. 1993). We have granted Jackson's petition for certiorari review. Jackson raises numerous issues, most of which were presented to the Court of Criminal Appeals. That court issued an opinion containing a lengthy and exhaustive review of these issues, and we find it necessary to address only three of them here.
The Court of Criminal Appeals set out the full details of this case; we will repeat only the following pertinent details from the evidence presented at trial. Tony Henderson was murdered in the early hours of April 20, 1991. At midnight, shortly before his death, Henderson was socializing at a nightclub; Jackson, who knew Henderson through mutual friends, arrived at the club some time after that. Witnesses observed the two sitting two seats apart at the bar for some time, and Jackson and Henderson left the bar at approximately 3:15 a.m.
About an hour to two hours later, Henderson's neighbor reported a fire at Henderson's house. Firefighters called to the scene discovered Henderson's nude, charred body, lying face down in a spread-eagle position. At approximately 4:40 a.m., police officers saw Jackson driving Henderson's car at a high rate of speed out of the housing project where Jackson lived; two persons were in the car with Jackson. After a chase, the officers arrested Jackson for driving under the influence of alcohol. *Page 1367 
They found Henderson's wallet under the seat of the car and his checkbook and a bank slip on Jackson's person. Jackson was ultimately charged with Henderson's murder.
At the close of Jackson's trial, the trial court instructed the jury as to capital murder, felony murder, theft in the first degree, and robbery in the first degree. The trial court explained the elements of capital murder and felony murder:
 "The highest species or type of unlawful killing in our state is termed capital murder. Two components, killing of a human being of the intentional type. The state must prove that the defendant, Jackson, or one with whom he was acting in concert . . ., as will be defined in a moment when we talk about accomplice liability, intentionally killed the deceased person, Mr. Henderson.
". . . .
 "Now, to act intentionally or purposefully in the killing component is what distinguishes capital murder from felony murder."
The trial court thus properly charged the jury that the intent to kill distinguishes capital murder from felony murder. The trial court went on to charge the jury as to the lesser included offenses of theft and robbery, including the element of intent as it relates to those offenses. The trial court then told the jury:
 "Now as you know, one must act intentionally in order to be guilty of any of the offenses charged, if you think about it. A capital offense requires an intentional killing component, it requires the intent to deprive the owner of his property, in the theft component of robbery.
 "The same in felony murder, though no intentional killing is required, must have the intent to deprive the owner of his property, in the theft/robbery component. The same with robbery first and theft first, that intent to deprive the owner of his property.
 "In this vein you heard the testimony concerning the defendant's ingestion of marijuana, the defendant's ingestion of marijuana and cocaine, I think, and some alcohol. In assessing whether or not the defendant's actions were intentional, you people may consider this evidence relative to the defendant's alleged voluntary intoxication.
 "Should you believe from the evidence that the defendant was so drunk or intoxicated at the time of the crime that he was incapable of formulating a specific intent, then you could not convict the man of any of the offenses charged."
(Emphasis added.)
Jackson first argues that, with these instructions, the trial court effectively told the jury that if it found that Jackson was too intoxicated to form the intent to kill, which was necessary to establish capital murder, then it could not find him guilty of any of the lesser included offenses because they also required intent. Jackson further argues that, by failing to instruct the jury on manslaughter, reckless murder, and murder, which do not require intent, the trial court created an "all or nothing" scenario that left the jury with no choice but to convict him of capital murder or set him free.
The trial court may refuse an instruction on a lesser included offense if it is clear to the judicial mind that there is no rational basis to support the instruction. Dill v. State,600 So.2d 343 (Ala.Crim.App. 1991), affirmed, 600 So.2d 372
(Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293,122 L.Ed.2d 684 (1993). As the Court of Criminal Appeals pointed out in its opinion, Jackson was driving Henderson's car and carrying his checkbook at the time of the arrest, and, according to Jackson's own testimony, he did not have permission to drive the car and did not have legitimate possession of the checkbook. The Court of Criminal Appeals therefore concluded that the offenses of manslaughter and reckless murder were inapplicable, because, it said, "no plausible theory of the evidence . . . would indicate that [Jackson] caused the victim's death — either intentionally, recklessly, or while intoxicated — but did not take the victim's property." 674 So.2d at 1328. Based on the evidence of Jackson's theft, the trial court's instructions on felony murder, robbery in the first degree, and theft in the first degree were the *Page 1368 
only lesser included offense instructions that were applicable. These instructions, and the trial court's detailed instruction as to the effect of intoxication on Jackson's intent to kill and/or to steal Henderson's possessions, were properly given.
Jackson next argues that, throughout the trial, the prosecutor improperly implied that Jackson was a homosexual and thereby inflamed the jury and violated his right to a fair trial. Jackson argues that in its case-in-chief the prosecution called two homosexual witnesses, both of whom were friends of Henderson, merely to insinuate that Jackson might be bisexual. Jackson also argues that the prosecutor improperly introduced forensic evidence that there was semen on Jackson's underwear when he was arrested and linked this with evidence that the victim might have been sexually assaulted before his death.
We find no prosecutorial misconduct in the introduction of this evidence. Neither of the two witnesses stated that Jackson was a homosexual or speculated at length as to whether he was; rather, they testified as to events leading up to the time of Henderson's death and as to certain aspects of Jackson's alibi. Moreover, Jackson himself testified that Henderson sexually propositioned him on the day before Henderson died and that he had reacted violently toward Henderson as a result. Because Jackson's sexual orientation was thus a factor in this case, and because the evidence concerning that orientation was not unduly emphasized, the court did not err in admitting the evidence suggesting that Jackson might be homosexual or bisexual and in allowing the jury to draw reasonable inferences therefrom.
Jackson raises numerous other issues concerning the guilt phase of his trial; however, after thoroughly reviewing the record as it relates to each of those issues, we must conclude that the Court of Criminal Appeals correctly resolved them. In addition, we have searched the record for any "plain error" within the guilt phase of Jackson's trial, regardless of whether it came to the attention of the trial court and the Court of Criminal Appeals; we have found no error so obvious that the failure to notice it would have seriously affected the fairness or integrity of the proceeding. Rule 45, Ala.R.App.P. We therefore turn to address an issue regarding the sentencing phase of Jackson's trial.
During the sentencing phase of his trial, Jackson was absent from the courtroom on two occasions. Jackson's mother appeared before the jury to plead for her son's life, and on that occasion Jackson asked to be removed from the courtroom to compose himself. He sat for several minutes in a room adjoining the courtroom, with the door ajar, as his mother continued to speak. When she finished speaking, Jackson returned to the courtroom and indicated that he wanted to remain there throughout the rest of the proceeding. Later during the sentencing hearing, Jackson spoke on his own behalf and told the jury that it would have to live with its decision. In closing argument, the following transpired:
 "[THE PROSECUTOR]: . . . But, you should also listen to [Jackson's] last words: 'Y'all have to live with what y'all have done.' He has to live with what he has done.
 "You have performed a vital function. You have considered evidence and you have spoken and you have found him guilty of —
 "THE COURT: Go ahead. Mr. Jackson wants to vacate the area and he is welcome to. Go ahead.
"[JACKSON]: You'll pay for it —
"THE COURT: No, sir.
"[JACKSON]: One way or the other —
 "THE COURT: Andy, Andy [an apparent reference to a court bailiff].
"[JACKSON]: — you're going to pay."
After Jackson was removed from the courtroom, the following occurred:
 "THE COURT [to Jackson's counsel]: I guess you could hear your man, he wanted to leave. I could hear and see he wanted to leave. Is this all right with you?
"[DEFENSE COUNSEL]: Yes sir, it's fine.
 "THE COURT: Doesn't have to attend if he doesn't want to, as you know." *Page 1369 
The balance of the proceeding, including closing arguments, jury instructions, and the jury's return of its verdict recommending the death penalty, was conducted in Jackson's absence.
Jackson argues that the trial court erred in first allowing him to voluntarily leave during his mother's pleas for his life and in then removing him from the courtroom after he spoke out during the prosecution's closing arguments. He contends that this violated his constitutional rights to due process, a fair trial, and a reliable sentencing determination.
In addressing this issue, the Court of Criminal Appeals erroneously relied on Flowers v. State, 608 So.2d 764
(Ala.Crim.App. 1992), overruled, Ex parte Thomas, 659 So.2d 3
(Ala. 1994). In Flowers, that court, construing Rule 9 and Rule 26.7, Ala.R.Crim.P., held that a defendant who has been present for the beginning of the guilt adjudication stage of his trial and then voluntarily absents himself forfeits his right to be present for the remaining portions of his trial, including the sentencing stage, if sentencing immediately follows the verdict. The defendant in Flowers was not, however, charged with capital murder, and the construction of Rule 9 and Rule 26.7 as applied in that case is not applicable here.
State law and federal law secure the right of a defendant accused of a capital crime to be present during all phases of the trial; without the defendant's presence at every stage, the court has no jurisdiction to pronounce judgment against the defendant. Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250,56 L.Ed. 500 (1912); Ex parte Hammond, 510 So.2d 153
(Ala. 1987); Lee v. State, 244 Ala. 401, 13 So.2d 590 (1943);Speer v. State, 570 So.2d 1271 (Ala.Crim.App. 1990); Proffittv. Wainwright, 685 F.2d 1227 (11th Cir. 1982). This right is set out in Rule 9.1, A.R.Crim.P.:
 "(a) Right to Be Present. The defendant has the right to be present at the arraignment and at every stage of the trial, including the selection of the jury, the giving of additional instructions pursuant to Rule 21, the return of the verdict, and sentencing."
(Emphasis added.) The rule further provides that a defendant charged with a capital offense may not waive the right to be present. Rule 9.1(b)(2)(i).
These authorities establish that a defendant in a capital murder case may not voluntarily waive the right to be present in the courtroom during the sentencing. The United States Supreme Court has established, however, that a defendant mayforfeit his right to be present at trial by exhibiting misconduct, Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057,25 L.Ed.2d 353 (1970):
 "Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, . . . we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."
397 U.S. at 343, 90 S.Ct. at 1060-61. This principle is also found in Rule 9.2, Ala.R.Crim.P.:
 "(a) Disruptive Conduct. If a defendant engages in disruptive or disorderly conduct so that the trial or other proceeding cannot be carried on in an orderly manner, the court, after having warned the defendant of the consequences of such conduct, may, if such conduct continues, order the defendant to be bound and gagged, or otherwise restrained or removed from the trial or proceeding."
(Emphasis added.)
We note that in Allen the pro se capital murder defendant persistently refused to follow the judge's instructions, argued with and threatened the judge, and mutilated court files. He was expelled from the proceeding only after the trial judge had warned him to stop his disruptive behavior and had given him an opportunity to do so. In this case, however, the record does not show that Jackson's behavior ever reached that level or that the trial court gave him any warning or opportunity to correct his behavior. When Jackson began speaking during the prosecutor's *Page 1370 
closing arguments, the trial court summarily had him removed from the courtroom, without a warning and without making any findings that would aid this Court in assessing the state of agitation Jackson was in. The only evaluation of Jackson's behavior came from the district attorney, who merely characterized it in his closing argument as an "outburst," and from a bailiff, who spoke on the record after the jury had already returned its verdict.
Because a capital murder defendant may not voluntarily waive the right to be present in the courtroom during sentencing, Jackson's first removal from the courtroom, although at his own request, was plain error. Further, after thoroughly examining the record, we must conclude that the evidence was insufficient to show that Jackson behaved in such a way as to forfeit his right to be present at the sentencing or to justify his removal from the hearing, especially at such a critical stage, without the warning required by Rule 9.2, Ala.R.Crim.P.
The judgment of the Court of Criminal Appeals is affirmed insofar as it affirmed the judgment of conviction. It is reversed insofar as it affirmed the judgment of sentence; and the cause is remanded for the Court of Criminal Appeals to remand for a new sentencing hearing.
AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, and HOUSTON, JJ., concur.