[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 666 
On the night of July 12, 1993, Patrick Cory Holman's body was found inside the trunk of a partially burned 1974 Oldsmobile Cutlass automobile. The Cutlass was parked on the side of Sanders Ferry Road near the entrance to the Royal Pines subdivision, a suburban neighborhood near Tuscaloosa. He had been killed instantly by a gunshot to the back of his head; his body had been placed in the trunk; and the automobile had been set on fire.
The appellant, Albert Mack III,[1] was indicted for murder, made capital because it was committed during a robbery. See Ala. Code 1975, § 13A-5-40(a)(2). The jury found him guilty as charged and, by a vote of 10 to 2, recommended that he be punished by death. The trial court accepted this recommendation and sentenced the appellant to death. This appeal followed.
Mack does not dispute that he intentionally shot Holman in the back of the head or that the shot killed him. He denies that the shooting occurred during the course of a robbery. Mack's theory of defense is that when he shot Holman, he believed that Holman and Holman's cousin, Carlos Green, intended to kill Mack and/or his friend Roy Craig, Jr.,[2] because Craig had sold Holman approximately $500 worth of "bad dope." Mack was a friend of both Craig and Holman and had facilitated the drug transaction between Craig and Holman by introducing Holman to Craig.
 "Because this case involves the death penalty, this court is obliged under Rule 45A, Ala.R.App.P., to review the record for any error that may have affected the substantial rights of the appellant. However, in Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973 (1995), this court noted:
 "`"The plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *Page 667 United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L. Ed.2d 816 (1982)."
 "`Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.' United States v. Butler, 792 F.2d 1528,
1535 (11th Cir.), cert. denied, 479 U.S. 933 (1986).'"Roberts v. State, [Ms. CR-93-1766, May 23, 1997] 735 So.2d 1244
(Ala.Cr.App. 1997) (capital murder case).
 GUILT PHASE I.
Mack contends that the trial court erred in refusing to grant a continuance on the first day of trial. The motion for a continuance stated as a ground his alleged diminished mental capacity. According to Mack, during the jury voir dire examination, he was under the influence of pain medication to such an extent that he suffered actual irrefutable prejudice.
Mack apparently attempted suicide the morning his trial was to begin. He was treated at approximately 8:00 a.m. in a hospital emergency room and received stitches for cuts to his wrists and neck. The defense alleged that Mack had been administered numbing pain medication at the hospital for these injuries and that that medication rendered him unable to stay awake. He was returned to the jail at about 10:00 a.m. and was then taken to the courthouse for the start of his trial. At 11:55 a.m., before the jury venire was present, the defense moved for a continuance stating the following:
 "MR. WILLIAMS [defense counsel]: [W]e would like to move to continue the proceedings from today on the basis that at approximately 8 a.m. this morning, the defendant injured himself in jail, that he was taken to DCH Regional Medical Center, that at that time he received pain medication and received numerous stitches, that he is in court today with bandages that cannot be concealed, that he has stitches and is still on pain medication. And it is approximately 11:55 now, that he was returned from the hospital around 10 a.m. this morning, that at the present time the defendant cannot effectively assist counsel in defending this case, that he is in pain at the present time. It would be, obviously, prejudicial for him to appear before a jury panel with bandages such as he has had now in court that cannot be concealed.
 "THE COURT: I would state in response to the motion that the injuries experienced by the defendant were reported to the Court from the jail personnel who were directly there on the scene to have been self-inflicted. And I would further state that in just viewing the defendant as he sits opposite me down now, he has a long-sleeved plaid shirt on and certainly there don't appear to be bandages or injuries on his wrist area. I can barely see the edge of a bandage poking up around the side of his collar. I wouldn't really note that it is a bandage as opposed to maybe a turtle neck shirt if I wasn't alerted to it. Assuming that the jury might discern one or more bandages on him, given the fact that my information is this was self-inflicted by the defendant and also given the fact that he has been released from the hospital or, that is, the emergency room, that the medical personnel did not see any need to detain him or restrict his activities, and given the fact that we will not be receiving a jury in this case until 1:30 this afternoon at the earliest — that is, we wouldn't start the voir dire until then — at which time any pain medication the defendant might have taken should have subsided, I am going to deny the motion for continuance.
 "MR. WILLIAMS: I will state for the record that the defense has received no *Page 668 
report from any doctor that says he is capable of resuming his normal activities or that he can proceed with the trial.
 "THE COURT: I didn't mean to infer such. I was basically relying on my experience with the emergency room physicians that they don't release somebody or at least they don't release them without restrictions if they consider there is some concern about the need for continued immediate health care treatment.
 "MR. WILLIAMS: Those are the motions we have at this time, Your Honor."
R. 187-89.
After the prosecution and defense attorneys conducted a general voir dire examination of the veniremembers, the venire was split into five panels and the trial court conducted aWitherspoon[3] inquiry and continued voir dire examination of those veniremembers that the court deemed needed further investigation. During the trial court's voir dire examination of the first panel of veniremembers, beyond the hearing of the jury venire, the following transpired.
 "THE COURT: Ms. B. [veniremember], you answered both when I questioned you concerning any jurors about prior information about this case or the death of Patrick Holman and also when I likewise asked about any person that had knowledge about the Roy Craig case. That is my reason for follow-up questions with you. Would whatever information you received from whatever source have any tendency to affect your impartiality or your verdict in this case? That is to say, do you think that what you have heard could have any tendency or possible tendency to carry over and influence your deliberations and your verdict in this case?
 "Mrs. B. [veniremember]: Yes, sir. And I have several problems with it. I mean, first of all, I know the guy was shot in the back of the head. And since we have been in here I have watched [Mack], and he's been dozing off like he doesn't care. And I mean I don't think I could be fair about it, to be honest."
R. 311-12.
When the trial court had concluded its questioning of the first panel the following occurred:
 "THE COURT: Counsel, let's talk about the practical mechanics, the options available to us. The options available to us are to go ahead do one more row tonight and tell the other three rows to come back or say we can do two more and have the other two remaining.
 "MR. WILLIAMS: My client — you have been observing him. My client has been given some deadening pain medication for the stitches that he received this morning. He's dozed off at least six times while we have been doing the voir dire. Even one of the jurors noticed that he had dozed off and mentioned it. I would request that since he's in such shape that we do one more row of voir dire. It obviously affects the impartiality of the jurors in this case. And tomorrow morning if we have to come back at 8:00 or 8:30 — either I want the case continued as the previous motion that I made or — you obviously now have evidence from a juror that observed he was asleep during the trial of the case. The Court observed the defendant dosing off. First I renew my motion for a continuance, and second, I request the Court not to go past one more row of jurors this afternoon.
 "THE COURT: I will respond to say that I have not observed your client doze off. That's not to say he has not. I have not been directing by attention to him at any time when he has. Although I have had him in my view from time to time, I have not seen him on occasion when he appeared to have dozed off. Secondly, he seemed quite alert and able to participate right now. As I have said *Page 669 
before, given the cause and effect relationship of why he might be in that shape, I can't allow that to control the conduct of the case. I think a practical thing is to do one more row. . . .
 "MR. WILLIAMS: I would request one more fact. When we do select the jury, whatever 14 that we put in the box, that they be instructed by the Court without any comment from the attorneys that Mr. Mack has been on medication during the jury striking process and that no inference would be taken from any of his actions during that time.
 "THE COURT: I will hear from you further on that. I am not satisfied at all that I am willing to give such an instruction at this point. I would need something from the doctor, what medication he's on, what its effect is. As I say, his having been treated and released very promptly from the emergency room, I call upon my common sense to tell me they couldn't have considered it that serious and couldn't have given him anything other than just some pain medication that might see him along for a while. You will have tonight to contact the emergency room or whoever treated him and get information that I can receive that will inform me on that.
"MR. WILLIAMS: Yes, sir."
R. 326-29.
Subsequently, during the third day of the trial the trial court made the following statement regarding Mack's mental awareness, which prompted the defense to again object to the court's failure to grant a continuance.
"(Jury not present)
 "THE COURT: I am going to place something briefly on the record. . . . I am going to put something on the record. I will state it is apparently 11:08 a.m. on this Wednesday, the third day of our trial. And I will simply go on the record to mention that after the question concerning Mr. Mack's alertness and ability to properly participate in his trial was raised and we had the remarks on the record yesterday or perhaps it was Monday — I forget exactly when all of that occurred — I acknowledged that I had not been looking at him. But I have made a point now from time to time to look his way every 10 or 15 minutes, and I will state for the record, to my ability to observe him, he seems quite alert and attentive and not under any apparent effect of any sort of medication and not in any sort of distress or discomfort. Obviously, I can only look briefly. I don't know what is going on in his head or body, but from the outward appearance, I will state for the record that he does appear as I just described. I mention that simply so the record can be brought up to date with respect to those matters.
 "MR. WILLIAMS: Your Honor, that was exactly the purpose of my motion to continue the case on Monday because of his condition at that time. I anticipated that, in fact, Mr. Mack would have the same effect that you have just described for this record, that he would be alert and able to participate in the trial. So, that was the purpose of my motion to continue at that time. As you know, we did have a juror to come in and say that she had observed the drowsiness of the defendant on Monday when the motion for continuance was made.
 "THE COURT: At that time, although we use the terms interchangeably, it would have been a venire person as opposed to a juror. She was one of the people we were interviewing individually during the selection process, and she did make that comment, which, I think, is on the record. We'll be in recess as previously stated."
R. 861-63.
Mack argues that "[t]here is hardly a more critical stage of trial than the process of striking a jury. Ford v. State,356 So.2d 720, 723 (Ala.Cr.App. 1978), quoted in Russaw v. State,572 So.2d 1288, 1294 (Ala.Cr.App. 1990)." Appellant's brief at page 39. *Page 670 
He contends that the trial court's refusal to grant a continuance on the first day of trial on the ground that Mack suffered diminished capacity "caused [the] two prejudicial, unfair reversible consequences" set forth below. Appellant's brief at page 39.
 I-A.
Mack contends that the trial court should have told the venire that his demeanor was the result of medication. Mack argues that forcing him to appear before the jury when medication prevented his staying awake, without telling the venire that his demeanor was affected by medication, was an abuse of the trial court's discretion. According to Mack, this resulted in the jurors' first impression of him being asleep during his capital murder trial. He asserts that this impression was prejudicial to his defense. He compares the severity of the prejudicial effect to that of the effect of a juror seeing a defendant in shackles,[4] and argues that dozing and sleeping during jury selection in a death case is more prejudicial. Moreover, he argues the prejudice was real because the jury venire included those veniremembers ultimately chosen to serve on his jury. He argues that he should have been granted a continuance to allow the medication to wear off.
Mack did not take advantage of the trial court's offer to present evidence indicating what medication he had been given. There was no confirmation from any source that Mack's drowsiness was in fact the result of medications. Therefore the trial court had no reason to so instruct the jury. See Campbell v. State,484 So.2d 1168, 1170 (Ala.Cr.App. 1985) (The denial of the continuance was not an abuse of discretion where the appellant asserted that he was taking medication that made him sleepy and the state opposed the motion in the absence of any medical testimony to the effect that taking these medications would "`in some manner cause problems for the defendant'").
 I-B.
Mack contends that the effect of his condition was essentially equivalent to his not being present during jury selection. Mack argues: "State law and Federal law secure the right of a defendant accused of a capital crime to be present during all phases of the trial; without the defendant's presence at every stage, the court has no jurisdiction to pronounce judgment against the defendant. Diaz v. United States,223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912); Ex parte Hammond,510 So.2d 153 (Ala. 1987); Lee v. State, 244 Ala. 401, 13 So.2d 590
(1943); Speer v. State, 570 So.2d 1271 (Ala.Cr.App. 1990);Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir. 1982)." Appellant's brief at page 41. Moreover, according to Mack, a capital defendant cannot waive his right to be present at every stage of his trial, including selection of the jury. Rule 9.1(b)(2), Ala.R.Crim.P.;[5] Ex parte Jackson, 674 So.2d 1365,1369 (Ala. 1994). He argues that the fact that the wounds were self-inflicted, which the trial court apparently weighed heavily in denying the continuance, had nothing to do with his right to be present during jury selection, and that the trial court should have granted a continuance.
We disagree with Mack's characterization of his condition as constituting a *Page 671 
constructive "absence" from the proceedings. We agree with the statements of the North Carolina Court of Appeals:
 "[A] defendant does not have to be at the highest stage of mental alertness to be competent to be tried. So long as a defendant can confer with his or her attorney so that the attorney may interpose any available defenses for him or her, the defendant is able to assist his or her defense in a rational manner. It is the attorney who must make the subtle distinctions as to the trial."
Harding v. North Carolina, 429 S.E.2d 416, 424 (N.C.App. 1993) (noncapital case). Here, the trial court did not find Mack to be so drugged as to be beyond aiding in his defense. The trial court stated that Mack "seemed quite alert and able to participate" during voir dire of the venire panels. R. 327. Additionally, our court long ago ruled that where a motion for continuance is based on the claimed illness of defendant: "The refusal of a continuance on such ground is not an abuse of discretion if the defendant can be put to trial without interference with his health." Shaneyfelt v. State, 40 Ala. App. 13,15, 109 So.2d 146, 148 (1958), aff'd, 268 Ala. 520,109 So.2d 149 (Ala. 1959); Redwine v. State, 36 Ala. App. 560, 61 So.2d 715
(1952). We find no error in the denial of Mack's motion for a continuance.
Nevertheless, if we assume, arguendo, that Mack was constructively absent during jury voir dire examination, he still was not entitled to a continuance. Mack acknowledges that his right to be present at every stage of the proceedings may be forfeited due to misconduct. Illinois v. Allen, 397 U.S. 337,90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); Rule 9.2, Ala.R.Crim.P. He contends that he did not engage in misconduct. We disagree.
A defendant's suicide attempt shortly before the commencement of his trial is a form of misconduct. It is irrelevant whether the suicide attempt was an intentional tactic to delay the trial. It is disruptive behavior because it pertains to impending court proceedings; a defendant will not be allowed, if it can be helped, to profit from such behavior. In other words, to find an abuse of discretion by the trial court in denying a continuance after a suicide attempt, the defendant's condition must be such that attending trial would seriously endanger his health, or his mental condition must be seriously diminished — beyond mere drowsiness. That was not Mack's case. In Kirkland v. State, 581 So.2d 1207 (Ala.Cr.App. 1990), a noncapital case,
 "[Kirkland] argue[s] that it was reversible error for the trial court to deny his motion for continuance, which was made on the grounds that he was under the influence of medication for a back injury, which, he says, rendered him incapable of assisting in his defense and denied him the effective assistance of counsel. The record indicates that the appellant requested a continuance, alleging that he had taken medicine which made him feel sleepy and groggy.
". . . .
 ". . . [T]he record indicates that the appellant took the medication on the morning of trial, knowing that he was to be in court and that his physician had stated that he should not take the medicine. Furthermore, the prescription indicated that the medicine was to be taken at bedtime, but the appellant purposefully took the pills at 8:00 on the morning of trial."
Kirkland, 581 So.2d at 1209-10. The Court of Criminal Appeals found that Kirkland was not entitled to a continuance on the ground that the medication made him drowsy, stating: "Under the doctrine of invited error, an appellant cannot voluntarily invite error by his own conduct and then seek to profit thereby."Kirkland, 581 So.2d at 1210 (citing Timmons v. State,487 So.2d 975 (Ala.Cr.App. 1986)).
In this case, a consequence of Mack's conduct was the prescribing of sleep-inducing pain medication. However, Mack's *Page 672 
injuries were not so severe as to prevent him from appearing for his trial.
Moreover, in looking at the record for possible plain error, if we could know that Mack's drowsiness was the result of pain medication, we still would not find error with the trial court's denial of the motion to continue. The only veniremember who expressed concern over Mack's demeanor was veniremember B. R. 311-12. Veniremember B. was removed from the venire for cause. R. 330. Mack has offered no proof of any actual prejudice among the selected jurors. There is no reason to assume that the remaining jurors held preconceived notions or fixed opinions regarding Mack's guilt. Speculative allegations regarding the possible existence of juror prejudice is insufficient to show that the trial court abused its discretion. Connor v. State,447 So.2d 860, 863 (Ala.Cr.App. 1984) ("The speculative allegations of defense counsel regarding the possible existence of potential witnesses or evidence are insufficient to show that the trial judge abused his discretion.").
 "`The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires "a positive demonstration of abuse of judicial discretion."'" . . . `This Court must determine whether or not there has been an abuse of discretion in light of the circumstances of each case, looking particularly to those reasons that defendant presented to the trial judge.'. . ."'"
Arthur v. State, [Ms. CR-91-0718, March 8, 1996] 711 So.2d 1031
(Ala.Cr.App. 1996) (capital case) (quoting Hays v. State, 518 so.2d 749, 757 (Ala.Cr.App. 1985)). Mack did not positively demonstrate an abuse of judicial discretion. An order denying a continuance is "purely within the sound discretion of court, and will not be reviewed unless gross abuse thereof affirmatively appears." Redwine v. State, 36 Ala. App. 560, 61 So.2d 715, 717
(1952) ("illness not a cause for continuance if an accused can be put to trial without interference with health"). Based on the record, we do not find that the trial court abused its discretion in denying a continuance on this ground.
 II.
Mack contends that the trial court erred in admitting into evidence the videotape showing the removal of Holman's body from the trunk of the burned Cutlass automobile. He argues that portions of the videotape were redundant and were unduly prejudicial. He correctly asserts that it is undisputed that Holman's body was found in the trunk of the Cutlass that had been set on fire, and that the trial court indicated early in the trial that an excessive number of still photographs depicting the same thing would not be allowed.
At trial the prosecution introduced a videotape an investigator at the crime scene made. Over defense objections, the trial judge admitted the video. The trial court did so without first having watched the video. We believe that the better practice would be for a trial court to view a videotape before admitting it into evidence.[6] However, we have viewed the videotape and, while its contents could be termed unpleasant, it is not so prejudicial as to affect the outcome of the case.
By our account, the tape played for 31 minutes and 48 seconds. Among the contents on the videotape were footage of the outside of the car, the inside of the car, the car's floorboards, the car tag, the area around the car, a spot on the ground, projectiles on the ground, repeated footage of Holman's body as it lay in the trunk — including close-up footage of Holman's *Page 673 
face — the removal of Holman's body from the car trunk to a gurney, officers' attempting to straighten Holman's arm, which was affected by rigor mortis, the trunk after the removal of Holman's body, the removal of Holman's wallet from the trunk, the inside of Holman's wallet, and the wallet being placed on the sheet covering Holman's body as it lay on the gurney.
At trial Mack requested that the repeated footage of Mack's body not be shown to the jury. He suggested some editing or covering the television screen to conceal this from the jury. The trial court denied the request. On appeal, Mack argues that the entire tape was cumulative to other evidence presented at trial; that it did not prove or disprove a disputed issue; that it did not illustrate or elucidate some relevant fact or evidence; and that it did not corroborate or disprove other evidence.
The videotape of the crime scene, including the footage of Holman's body, was admissible.
In Ex parter Siebert, 555 So.2d 780, 783 (Ala. 1989), a capital case, Siebert argued that "the court erred in admitting into evidence a videotape of the crime scene, which was filmed by the police before the victims' bodies were removed. Siebert contends that the videotape was prejudicial and that it was cumulative of the photographic evidence also admitted." Siebert, 555 So.2d at 783. The victims in Siebert were a 24-year-old mother and her 4- and 5-year-old sons. A police officer videotaped the interior of the victims' apartment before the crime scene was disturbed. "The trial court admitted the videotape into evidence and permitted the jury to view it, over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative, and that the portion of the tape showing the photographs of the family that were hung on the apartment walls had no probative value." Id. The Alabama Supreme Court affirmed the Court of Criminal Appeals' holding that the trial court did not err in receiving the videotape into evidence, stating:
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App. 1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071
(Ala.Cr.App. 1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91
 (Ala.Cr.App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App. 1984)."
Siebert, 555 So.2d at 783-84.
Here, as in Siebert, the prosecution established the proper foundation, and there was no question about the videotape's authenticity. We find no abuse of discretion in the trial court's admission of the videotape into evidence. "`Perpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence.'" Price v. State, [Ms. CR-92-0882, June 20, 1997] *Page 674 725 So.2d 1003 (Ala.Cr.App. 1997) (citing Jenkins v. State,627 So.2d 1034, 1045 (Ala.Cr.App. 1992), aff'd, l627 So.2d 1054 (Ala. 1993)).[7]
 III.
Mack contends that he should be granted a new trial because, he says, the jury foreman slept through most of the jury charge. Mack concedes on appeal that when the trial court presented him the opportunity to replace this juror with an alternate he declined. Nevertheless, according to Mack, the presence of this juror "disrupted and contaminated the deliberative process" of the guilt phase of the trial because, he says, other jurors "would certainly pay little or no attention to the arguments, perspectives, and views of this juror, since he obviously did not pay attention to the proceedings." Appellant's brief at page 47.
Moreover, Mack contends that the foreman's conduct tainted the sentencing portion of the trial. He argues that § 13A-5-146(f), Ala. Code 1975, requires a majority of jurors to recommend a sentence of life in prison and 10 votes to recommend a sentence of death. Mack argues that this "nonfunctioning" juror left the deliberative body without the ability to conform to the trial court's charge. Appellant's brief at page 47. Mack correctly asserts, in support of his contention, that the jury foreman initially signed the wrong verdict form during the sentencing phase of the trial. However, he also points out that this juror voted for life imprisonment instead of death.
This argument has no merit. The record reveals that the trial court thoroughly advised Mack of its observations concerning this juror and gave Mack the option of replacing this juror with an alternate. This juror was specifically retained on the jury at Mack's request. The principle of invited error applies in a capital case. Rogers v. State, 630 So.2d 78, 84
(Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 88 (Ala. 1992) ("defendant's were clearly informed of the possible repercussions of the consolidation of their cases and, with this knowledge, they decided to pursue their motion to consolidate"). Thus, Mack is estopped from raising this objection under the doctrine of invited error. Johnson v. State, 620 So.2d 679, 695
(Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993) ("identification charge to which the appellant's now objects was given at the appellant's request"). Moreover, Mack offered nothing more than speculative generalities in support of the assumption that the sleeping foreman tainted the deliberative process. Moreover, there is nothing in the record on which to base a finding of plain error on this issue.
 IV.
Mack contends that the evidence was insufficient to support a conviction for robbery/murder and that therefore, his motion for a judgment of acquittal *Page 675 
should have been granted. He correctly argues that in order to be found guilty of robbery/murder, he had to be found guilty of robbery in the first degree. § 13A-5-40(a)(2) and13A-8-41, Ala. Code 1975. He also correctly states that "the commission of the robbery cannot be a mere afterthought, but must be a part of the continuing course of conduct. Connolly v. State, 500 So.2d 57 (Ala.Cr.App. 1985), aff'd, 500 So.2d 68
(Ala. 1986)." Appellant's brief at page 48. Mack's theory of defense is that he intentionally shot Holman because he feared Holman was going to kill him and or his friend, Craig, over a drug transaction he facilitated between Holman and Craig. "If the robbery and murder are unrelated events, a capital conviction cannot stand." Roberts v. State, [Ms. CR-93-1766, May 23, 1997] 735 So.2d 1244 (Ala.Cr.App. 1997).
Here, the robbery element was established through the eye-witness testimony of Anthony Carlos Green, and through circumstantial evidence. The jury also heard conflicting testimony. "`The weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury. . . . A defendant's guilt may be established by circumstantial evidence as well as by direct evidence.'" Mitchell v. State, [Ms. CR-94-2245, March 21, 1997]450 So.2d 181 (Ala.Cr.App. 1997) (quoting Smith v. State,698 So.2d 189, 214 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (1997)). The following testimony, if believed by the jury, supports a finding of guilty of murder made capital because it occurred during a robbery.
Monique Holman, Holman's sister, testified that on the morning of July 12, 1993, she gave Holman $60 to have her car repaired and that after he had the car repaired he did not return any change. At about 3:30 that afternoon she gave Holman $180 cash and her Cutlass automobile to pay her bills. The bills were not paid and Holman had only 63 cents when his body was discovered.
On July 12, 1993, Mack, Anthony Carlos Green, and Holman attended a party at Jerome Sealy's home. At some point, Mack, Holman, and Green left the party in the Cutlass. They went to Craig's house, and Craig joined the three men. It was at this time that Mack stated that he suspected that he and Craig were being "set up" to be killed by Holman because of the drug transaction that had gone bad.
Mack stated in his videotaped statement to police that at about 6:00 or 7:00 p.m. on the evening on July 12, 1993, he agreed to help Green rob Holman later that night. However, he stated that he assumed the robbery would consist only of taking Holman's money after the three men left the bar they planned to visit after the party. By this time, which according to Mack would have been very late, Holman would be very drunk and Mack assumed he and Green could just take his money.
Green testified that in the early evening on July 12, 1993, Mack had stated in front of Holman that he needed some money to go to Detroit. At that time Green saw Holman pull some cash part of the way out of his front pants pocket and then put it back. Green saw a $20 bill at that time. Holman also had a pistol with him on the night of his death.
Angela Sewall, Mack's cousin, testified that before leaving Jerome Sealy's party Mack removed a brown bag from the trunk of her car. She believed that the bag contained a gun. Mack stated that he was going with friends to buy beer and told her that his friend had about $500 and that he was concerned that someone would try to rob him.
Green testified that at some point he, Holman, Craig, and Mack left Sealy's party. While they were riding in Holman's car, Mack shot Holman in the back of the head. Green recounted the event as follows. As the automobile slowed on approach to an intersection, Green heard a loud bang. He turned and Mack was pointing his .44 caliber pistol at him and *Page 676 
stating: "This is Crips[8], kuz; you are witness to a murder." R. 681. Holman had a "hole" in the back of his head and appeared to be dead. Mack told Craig to grab the steering wheel and the car swerved into a parking lot. According to Green, Mack told Craig to "Get that nigger's money; get that nigger's gun" (R. 681), referring to Holman. Green said that he saw Craig grabbing at Holman's pockets. As stated above, the weight given Green's testimony was to be determined by the factfinder. Green said he ran away the first chance he got.
Dayna Noland, Mack's cousin, testified that Mack returned to Jerome Sealy's party without his shirt and with Holman's gun.
Katina Monique Harper, who testified that she was Mack's wife, and Monica Hewitt, Mack's sister, testified that they saw Mack at some time after 9:30 or 10:30 p.m. the night Holman was killed. Mack was crossing 15th Street on foot and they called for him to get into the car they were in. At that time Mack stated that he was in trouble and needed some money to get out of town. R. 1037-38. Monica said that Mack said "`I need some loot because I need to catch the first thing smoking out of town,' which meant he needed some money and needed to catch a bus." R. 1046. Monica said Mack did not have any guns or money at that time. According to Harper, Mack did not have any money when he left home earlier that day and he did not have any on him when he got into the car. Mack tried to borrow money or to have a sister give him a bus ticket to New Orleans, but these efforts failed. Mack asked to be taken somewhere to clear his head and get his thoughts together. He was taken to Aspen Village Apartments. Harper said that she received a telephone call stating that Mack needed clothes. Later that same morning she returned to Aspen Village with some clothes for Mack. A young white man named Erick met her in the parking lot and took the clothes. Harper testified for the first time at trial that she also took Mack approximately $50 at that time.
Diana Reyes testified that when Mack was hiding at her apartment at Aspen Village, he told her that he and his friend took Holman's money and his gun after Holman was dead. She stated that from the time Mack arrived until the police got him, he spent a lot of money ordering pizzas. She said sometimes two or three times a day — but the record reflects that he was at her apartment for only one full day and one night. R. 827. He also sent her to the store to get shaving cream and other necessities. R. 826-27. Reyes admitted that she was not home the entire time Mack stayed there. She did not know that Mack's wife had brought something to Mack at the apartment until her brother, Erick Reyes, told her. But she contends that no one brought Mack any money because her brother took the clothes Mack's wife had brought and there was no money.
Mack had no money on him when he was arrested at Aspen Village late in the morning of July 15, 1993. No weapon was ever found in connection with this murder.
Whether Mack intended to kill Holman in order to take his gun, money, and car, or whether robbing Holman was an afterthought after killing him was for the jury to determine.
 "`Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery, . . . the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. . . . The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. . . . The *Page 677 
defendant's intent to rob the victim can be inferred where "the intervening time, if any, between the killing and robbery was part of a continuous chain of events." . . .
 "`The question this Court must answer is whether "there was sufficient evidence presented by the State, from which the jury could infer that the appellant was guilty of the capital offense charged, beyond a reasonable doubt."'"
Cowan v. State, 579 So.2d 13, 17 (Ala.Cr.App. 1990) (citingConnolly v. State, 500 So.2d 57, 63 (Ala.Cr.App. 1985), affirmed,500 So.2d 68 (Ala. 1986); Roberts v. State, [Ms. CR-93-1766, May 23, 1997] 735 So.2d 1244 (Ala.Cr.App. 1997) (capital case) ("The defendant's intent at the time of the crime is a jury question, however. . . . The defendant's intent to commit robbery-murder may be correctly inferred where the killing and robbery were part of a continuous chain of events."). Sufficient evidence was presented from which the jury could infer that Mack committed an intentional killing during the course of a robbery.
 V.
Mack contends that the trial court erred by denying him aBatson[9] hearing to determine whether the prosecutor used his peremptory challenges in a racially discriminatory manner. He argues on appeal that the defense showed that the African-American composition on the venire was 12%, while the African-American population of the county as a whole was approximately 26%. Additionally, according to Mack, the State used peremptory strikes to remove 5 of 8 African-American veniremembers. According to Mack, these facts establish a prima facie case of racial discrimination by the State, requiring the State to offer its reasons for the challenged strikes. InArmstrong v. State, [Ms. CR-96-0930, October 31, 1997]710 So.2d 531 (Ala.Cr.App. 1997), this court again stated that "bare statistics were not sufficient to make a prima facie showing of discrimination." Moreover, in finding that Mack failed to establish a prima facie case, the trial court stated:
 "THE COURT: I do not find a prima facie case has been established. Obviously, numbers are not always controlling, but, nonetheless, I recognized the State had 21 strikes available. Had it wished to eliminate all of the African-American jurors, it could have done so. And, further, the Court is able to look at the five jurors that the State struck and readily recall responses they gave during voir dire that would, to the Court's mind, seemingly establish a race-neutral reason for eliminating them. We're not to that point because I recognize that if I call upon the State to give reasons, that automatically dispenses with the prima facie case finding and puts us in a different posture. And I genuinely do not feel that a prima facie case has been established. So, I am not going to call upon the State for the provision of any reason.
 "The Court will state further, however, because this is one of the considerations that certainly in Ex parte Branch and the other cases they have pointed out is significant, that I judicially know that the District Attorney's office in general and Mr. Lemley in particular do not exercise their peremptory strikes in a racially discriminatory manner. I have had ample experience with Mr. Lemley striking cases before me in which there was every composition of race or ethnicity or gender of the various parties involved or interests otherwise, and I have to this date never had an occasion where I found that he had exercised his strike in a racially discriminatory manner. And a number of those cases, of course, because of the other considerations, I have erred on the side of finding a prima facie case and called upon him to give reasons. I do take that into consideration and otherwise do not find that a prima facie case is established. *Page 678 
 "I would say to the State, though, I will encourage you perhaps this evening to sit down and while it is all fresh on your mind make a memorial for your file of all the considerations that entered into your striking of the various strikes so that if we have to revisit this at some later date, we would not be at a disadvantage because memories faded and your notes could be misplaced."
R. 547-49.
In Watkins v. State, 509 So.2d 1074 (Ala. 1987), a capital case in which the issue was the retroactive application ofBatson, the Alabama Supreme Court refused to remand a capital case for a Batson hearing stating that the record "does not show that the state exercised any of its peremptory challenges to remove prospective black jurors from the venire. The record as a whole simply does not raise an inference that the state was engaged in the practice of purposeful discrimination." Watkins, 509 So.2d at 1076; See Kuenzel v. State, 577 So.2d 474
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (1991); and Magwood v.State, 553 So.2d 635 (Ala.Cr.App. 1989). Although Watkins involves a plain error analysis, the principle it embodies is also true in Mack's case. The record does not raise an inference that the State was engaged in the practice of purposeful discrimination in striking jurors. We find no error with the trial court's ruling that the defense failed to establish a prima facie case of racial discrimination in the State's jury selection.
 VI.
Mack contends that the trial Court used what he says was a misstatement in a presentence investigative report prepared by defense witness Dr. Raymond O. Sumrall, Ph.D., as grounds to reject consideration of alleged mitigating circumstances. Mack argues that during the sentencing hearing, Dr. Sumrall submitted a report that included Mack's assertion that he had participated in the invasion of Panama. It was later determined that Mack was in prison in California during the Panama invasion. Sumrall stated that he may have misunderstood Mack as to this incident, but that his conclusions and opinions would not change based on this change in the information. The trial court specifically found in its sentencing order that Mack had lied to Sumrall. "On this basis, the Court found the mitigating factors to be without merit or insufficient." Appellant's brief at page 51. According to Mack, the statement referred to by the Court in its order was a possible error by Sumrall, not a lie by Mack, and therefore, he says, it should not have been used to reject the mitigating circumstances presented.
Dr. Sumrall's written report contained the following information.
"The Military Period:
 "Albert enlisted in the USMC in the hope that it would help him find himself. He thought the pride and loyalty to the Corps would be valuable to him. However, he found that the Corps forced him into greater dependence on his own self-reliance. While he learned greater self-discipline in some areas, it was those areas which he felt were part of his `dark side,' e.g., the integration of aggression as a way of life. Albert participated in the Panama invasion. This experience particularly exacerbated his fear and suspicious nature, not knowing who was friend or foe and with friends being killed by `friendly fire.'"
C.R. 235. It was Sumrall's conclusion that a sentence of life imprisonment without parole was appropriate in Mack's case. The trial court heard Dr. Sumrall testify that changing that one fact about the Panama invasion did not have any bearing on his evaluation of Mack.
The trial court's sentencing order contained stated the following:
 "Additionally, it was established at today's sentence hearing that [Mack] apparently misrepresented to Dr. Sumrall that he had `participated in the Panama invasion' in some fashion, which would *Page 679 
have been impossible given that the evidence establishing that the invasion took place in December of 1989, and that the Defendant was incarcerated in California continuously from March 1989 to May 1992. The Defendant had been discharged from the United States Marine Corps in December of 1988 for misbehavior, as recounted by Dr. Sumrall's said presentence investigative report."
C.R. 248.
 "`What we do require is that, before determining the sentence, the trial court consider all the available evidence; hear arguments on aggravating and mitigating circumstances; enter written findings of fact summarizing the crime and the defendant's participation in it; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; and weigh the advisory verdict of the jury; consider and weigh the presentence investigation report; hear arguments on aggravating and mitigating circumstances; consider and weigh the mitigating and aggravating circumstances; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; determine that the aggravating circumstances outweigh the mitigating circumstances; consider all the available evidence; and enter written findings of fact summarizing the crime and the defendant's participation in it. We believe that this scheme adequately channels the trial court's discretion so as to prevent arbitrary results. . . .'"
McNair v. State, [Ms. CR-95-0470, July 3, 1997] 706 So.2d 828, (Ala.Cr.App. 1997) (emphasis added) (quoting Bush v. State,695 So.2d 70, 94 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (1997)). It is clear that the trial court considered and weighed the defense's presentence investigation report as it concerned Mack's military record. Based on the circumstances, we find no error with the trial court's conclusion that the evidence concerning Mack's military record was insufficient to establish the mitigating circumstance.
 VII.
Mack contends that the trial court erred by referring to capital murder as the "main offense" in its charge to the jury. According to Mack, referring to the capital charge as the "main offense" unduly emphasized for the jury that a verdict on noncapital murder would somehow be a lesser result. The totality of the charge, however, put the phrase "main offense" in perspective.
 "`"When reviewing the propriety of a trial court's jury charge, this Court must consider the charge as a whole, in its totality, without isolating statements, which individually may appear prejudicial, from the context in which they were made." . . . As long as combined directions in original and supplemental charges accurately present the controversial point of law, ordinarily no reviewable error exists.'"
Siler v. State, [Ms. CR-95-2213, May 2, 1997] 705 So.2d 552, (Ala.Cr.App. 1997) (quoting Spears v. State, 500 So.2d 96, 99
(Ala.Cr.App. 1986) (emphasis omitted) (citations omitted)). We have reviewed the trial court's charge to the jury and found that taken as a whole, the reference to the capital charge as the "main offense" did not place undue emphasis on the capital charge.
 VIII.
Mack contends that the cumulative effect of the above alleged errors lends serious doubt to the fairness of his trial and that he should be granted a new trial. "`Because no single instance of alleged improper conduct constituted reversible error, this Court will not consider the *Page 680 
cumulative effect to be greater error. McNeely v. State,524 So.2d 375 (Ala.Cr.App. 1986); Johnson v. State, 541 So.2d 1112
(Ala.Cr.App. 1989).' Crymes v. State, 630 So.2d 120, 123-24
(Ala.Cr.App. 1993), aff'd, 630 So.2d 125 (Ala. 1993)." Boyd v.State, [Ms. CR-94-1523, January 17, 1997] 715 So.2d 825, (Ala.Cr.App. 1997) (capital case). Mack is not entitled to relief as to this claim.
 SENTENCING IX.
This court is required by § 13A-5-53, Ala. Code 1975, to review the propriety of the appellant's sentence of death and to examine this record for plain error.
We have reviewed the trial court's findings concerning the aggravating and mitigating circumstances in this case. The trial court found three aggravating circumstances: 1) that the capital offense was committed while Mack was under a sentence of imprisonment, which includes while on probation or parole, 2) that Mack had previously been convicted of a felony involving the use or threat of violence to the person, and 3) that the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, a robbery. The trial court considered as statutory mitigating circumstances the fact that Mack was only 25 years and 9 months old at the time of the crime. However, the Court recognized that this mitigating circumstance is relatively weak, because that age is the outer margin of what the Court would consider a "young" age.
As nonstatutory mitigating circumstances the trial court found: 1) that Mack had experienced a somewhat troubled youth; 2) that Mack had consumed some quantity of alcohol on the night of the crime; 3) Mack had experienced some emotional problems over the course of his life and, in particular, had manifested some emotional problems during the weeks preceding the crime; 4) that Mack has expressed remorse about the crime; 5) that Mack has voluntarily participated extensively in the "Scared Straight" program conducted for young people by the Sheriff of Tuscaloosa County; 6) that Mack was willing to testify at the trial of Roy Craig, Jr.; 7) that Mack exposed and cooperated in developing evidence of an ongoing incident of compromised internal security at the jail; 8) that Mack assisted law enforcement by making a video used at the Law Enforcement Academy concerning gangs; and 9) that Mack assisted by serving as a cellmate "buddy" to inmates thought to be suicidal. In addition to the findings concerning Mack's involvement in the Panaman invasion, the trial court found that Mack's "conduct and attitude" subsequent to his arrest and incarceration must
 "necessarily be viewed with a certain amount of skepticism about their genuineness and sincerity, given the obvious self-serving motivation the Defendant has had with respect to the same. Even while conducting himself in an outwardly positive manner with respect to them, he was shown by Sheriff Sexton's testimony at the penalty phase of the trial to have engaged in some seven or eight incidents involving fights or verbal altercations with guards and other inmates during his period of incarceration."
C.R. 248.
"[W]e find no evidence that the appellant's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances convinces us that death is the appropriate and proper sentence in this case." Brooks v.State, 695 So.2d 176, 184 (Ala.Cr.App. 1996), aff'd,695 So.2d 184 (Ala. 1997).
Furthermore, the appellant's sentence of death is not disproportionate to the penalty imposed in similar cases, considering the crime and this appellant. See Beck v. State,396 So.2d 645, 654 n. 5 (Ala. 1980).
Pursuant to Rule 45A, Ala.R.App.P., we have thoroughly reviewed the record in *Page 681 
this case, and we find no error that has adversely affected this appellant's rights during either the guilt or sentencing phase of this trial. The appellant's conviction for this capital offense and his sentence of death are proper. The judgment of the trial court is affirmed.
AFFIRMED.
All the judges concur.
[1] Also referred to at various points in the record as "Man."
[2] Craig was indicted for capital murder. Based on Mack's confession, which was introduced as evidence Craig's trial, the indictment in Craig's case was amended to charge felony murder. Craig was acquitted of felony murder.
Craig's whereabouts at the time of Mack's trial were unknown; therefore, he did not testify.
[3] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968).
[4] Permitting the jury to see a defendant in shackles is not always an abuse of discretion. Campbell v. State,484 So.2d 1168, 1170 (Ala.Cr.App. 1985).
[5] After Mack's trial, Rule 9.1(b)(2)(ii), Ala.R.Crim.P., was amended effective December 1, 1997. The amended rule states: "A defendant may not waive the right to be present if: . . . The defendant has been convicted of an offense that may be punishable by death and sentence is being imposed." The Committee Comments to this section state: "The amendment to Rule 9.1(b)(2) allows a defendant charged with a capital offense to waive his or her right to be present at any stage of the proceedings, except for sentencing, provided the waiver complies with the provisions of Rule 9.1(b)(1)."
[6]"In order to forestall the risk of infliction of undue prejudice upon the party against whom the moving picture is offered, it is suggested that the trial judge would do well to retire the jury from the courtroom and require a showing of the motion picture so that the judge can determine whether there is anything in the picture that is not proper to be shown to the jury." Charles W. Gamble, McElroy's Alabama Evidence, § 123.06, 566 (5th ed. 1996).
[7] State v. Kandies, 342 N.C. 419, 467 S.E.2d 67 (1996) (citing State v. Leazer, 337 N.C. 454, 456-57, 446 S.E.2d 54,55-56 (1994), admission of videotape of crime scene, including removal of victim, upheld); State v. Leazer, 337 N.C. 454,446 S.E.2d 54 (1994) (The contested portion of the condensed video-tape showing the body being turned over, placed in a body bag and on a stretcher, then the transporting of the body to one of the elevators for removal from the facility was relevant to illustrate the crime scene); State v. Smith, 773 P.2d 139 (Wyo. 1989) (videotape showing the removal of the body from crime scene was not prejudicial and inflammatory); State v. Bates,804 S.W.2d 868 (Tenn. 1991) (videotape showing an anthropologist taking the skull from the body and removing matter from it and part of the skull falling away, and showing the mass of damage done to the back of the skull was admissible even though showing the victim's remains and their removal was, if not completely irrelevant to any issue, totally unnecessary and cumulative to other less potentially prejudicial proof because it was not particularly gruesome and did not appear to be so prejudicial and inflammatory as to call into question the reliability of the sentencing proceeding so as to warrant reversal).
[8] Apparently a reference to a gang.
[9] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986).